IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Jennifer Casillas-Guardiola, | |
| Plaintiff, | |
| v. | Civil No. 22-1167 (GMM) |
| Bayer Puerto Rico, Inc., et al, | |
| Defendants. | |

## OPINION AND ORDER

Pending before the Court are the parties' cross-motions for summary judgment: Plaintiff Jenniffer Casillas-Guardiola's ("Plaintiff" or "Casillas") *Motion for Summary Judgment* ("Plaintiff's Motion for Summary Judgment") (Docket No. 96), and Defendant Bayer Puerto Rico Inc.'s ("Defendant" or "Bayer") *Motion for Summary Judgment and Memorandum of Law in Support Thereof* ("Bayer's Motion for Summary Judgment") (Docket No. 101). Also pending before the Court is Plaintiff's *Motion In Limine and Requesting order to Strike Exhibit 14 [Docket 100-4] from Defendant's Motion for Summary Judgment* ("Motion to Strike"). (Docket No. 121).

For the foregoing reasons, Plaintiff's *Motion In Limine and Requesting order to Strike Exhibit 14 [Docket 100-4] from Defendant's Motion for Summary Judgment* at Docket No. 121 is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's hearsay challenge is denied, the *Unsworn Statement under Penalty of Perjury* is not

excluded, referenced e-mails are authenticated, and Mrs. Otero's affidavit is considered solely for authentication purposes.

The Court also **GRANTS IN PART AND DENIES IN PART** Defendant's *Motion for Summary Judgment and Memorandum of Law in Support Thereof* at Docket No. 101 and **GRANTS IN PART AND DENIES IN PART** Plaintiff's *Motion for Summary Judgment* at Docket No. 96. Plaintiff's Title VII discrimination, Law 80, Law 100, Law 69, and Law 3 claims survive, and Plaintiff's Title VII retaliation, Article 1536, and COBRA claims are dismissed.

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On April 8, 2022, Casillas filed a *Complaint* against Bayer. Casillas alleged that she was subject to pregnancy and sex discrimination, retaliation, and wrongful termination in violation of federal and state civil rights statutes. (Docket No. 1). Specifically, Casillas sustains that Bayer violated Title VII of the Civil Rights Act of 1964, ("Title VII") 42 U.S.C. §§ 2000(e) et seq. and Puerto Rico Law No. 3 of March 13, 1942 ("Law 3"), as amended, P.R. Laws Ann. tit. 29 § 467 *et seq.*; No. 69 of July 6, 1985, as amended, P.R. Laws Ann. tit. 29 § 1321 *et seq.* ("Law 69"); and No. 100 of May 30, 1976, ("Law 100") as amended, P.R. Laws Ann. tit. 29 § 185 *et seq.* (Id.). Casillas also seeks redress pursuant to the Consolidated Omnibus Reconciliation Act, 29 U.S.C. §§ 1161-1169 ("COBRA"), the Puerto Rico Civil Code of 2020, P.R.

Civil No. 22-1167 (GMM)
Page -3-

Laws Ann. tit. 31 § 10801, and Law No. 80 of May 30, 1976, ("Law 80") as amended, P.R. Laws Ann. tit. 29 § 185a *et seq*.

A.  <u>Plaintiff's Motion for Summary Judgment</u>

On December 5, 2024, Casillas filed a *Motion for Summary Judgment*. (Docket No. 96). Plaintiff asserts that the uncontested material facts demonstrate that she established a *prima facie* Title VII discrimination case, since she was seven months pregnant at the time Defendant terminated her employment. (<u>Id.</u> at 5-14). Further, Casillas sustains that Bayer's asserted justification for the termination is false and a pretext to discriminate against her on the basis of her pregnancy, and that Bayer cannot meet the required burden to establish a legitimate, nondiscriminatory motive and an explanation for her termination. (<u>Id.</u>). Regarding the Title VII retaliation claim, Casillas asserts that she was subject to retaliation because she did not sign the Severance Agreement she was offered and continued to request information related to COBRA and the health plan. (<u>Id.</u> at 19-20).

As for the claims arising under Puerto Rico law, Casillas posits that since she has established a *prima facie* case under Title VII, she has also met the necessary elements under the equivalent Puerto Rico laws. (<u>Id.</u> at 16). Regarding the wrongful termination claim under Law 80, Casillas argues that since Bayer cannot establish a legitimate, nondiscriminatory motive or an

Civil No. 22-1167 (GMM)
Page -4-

explanation for her termination, Bayer is unable to meet its burden of proof to establish good cause for her termination. (Id. at 16-17). As to the claim pursuant to COBRA, Casillas contends that she did not receive the *Notice of Rights to Elect Continuation of Group Health Coverage* ("COBRA notice") from Bayer, who referred the process to a third party, Fidelity Workplace Services, LLC ("Fidelity") who also failed to send notice. (Id. at 18-19).

On February 5, 2025, Bayer filed an *Opposition to Plaintiff's Motion for Summary Judgment* and an *Opposition to Plaintiff's Statement of Uncontested Facts and Bayer Puerto Rico's Local Rule 56(C) Additional Facts*. (Docket Nos. 110; 111). Bayer argues that Casillas conceded that the Project Thrive restructuring or reduction in force ("Project Thrive") occurred nationwide. (Docket No. 111 at 6). Hence, Bayer posits that Casillas' termination was due to Project Thrive and that Bayer is able to produce a legitimate, nondiscriminatory reason for Plaintiff's termination because: (i) Plaintiff's supervisor, Aileen Badía Saavedra ("Badía"), received a directive from her direct superior stateside, Steve Morante ("Morante"), instructing that as part of Project Thrive one full-time employee position in the Puerto Rico Consumer Health Division had to be eliminated; (ii) that as early as November 2020, employees in the Puerto Rico Consumer Health Division including Plaintiff were well aware of Project Thrive;

and that (iii) written correspondence exists between Morante and Badía discussing and submitting the decision as to which position in the Puerto Rico Consumer Health Division was to be impacted by Project Thrive. (Id. at 5).

Further, Bayer posits that Casillas lacks evidence to prove pretext. (Id. at 8). To this point, Bayer argues that Casillas "has only put forth only her own testimony wherein she nakedly speculates that 'maybe they didn't want to have someone out of a job for a minimum of 13 weeks, which I was entitled to have time with my baby because of law and company policies. A minimum of 13 weeks. That's a lot of time to have an empty chair . . . there was a lot of work to be done. And I imagine that's the reason.'" (Id. at 8-9). As for Plaintiff's discrimination claims under Puerto Rico law, Bayer posits that they equally fail for the same reasons. (Id. at 9).

As to the claim for wrongful discharge under Law 80, Bayer contends that the undisputed facts on record are more than enough to establish that the reason for Plaintiff's termination was Project Thrive. (Id. at 10). Regarding the retaliation claims both under Title VII and Puerto Rico law, Bayer contends that Plaintiff merely made conclusory allegations that "she was subject to retaliation" and that "the mere fact of 'getting pregnant' does not constitute protected conduct for purposes of retaliation under

Civil No. 22-1167 (GMM)
Page -6-

Title VII." (Id. at 14). In addition, Bayer posits that the
allegations as to the Severance Agreement do not amount to
retaliation. (Id. at 14-15). Furthermore, as to the COBRA claims,
Bayer argues that it is the plan administrator who must notify the
employee of their COBRA rights within fourteen (14) days, and that
Plaintiff has put forth no allegations and no evidence that Bayer
Rico is the plan administrator. (Id. at 15).

On February 25, 2025, Casillas filed a *Reply to Defendant's
Opposition to Plaintiff's Statement of Uncontested Facts and
Response to Defendant's Statement of Additional Facts Under Local
Rule 56(c)* and a *Reply to Bayer's Opposition to Plaintiffs' Motion
for Summary Judgment*. (Docket Nos. 124; 125).

B.    Defendant's Motion for Summary Judgment

On December 5, 2024, *Bayer's Motion for Summary Judgment* was
filed. (Docket No. 101). Therein, Bayer argues that "the record is
devoid of any direct evidence of discrimination on the basis of
Plaintiff's pregnancy." (Id. at 15). Hence, Bayer posits that under
the McDonnell Douglas framework, Plaintiff's claims fail because
she needed to offer minimally sufficient evidence, direct or
indirect, both of pretext and of the employer's discriminatory
animus to prevail. (Id. at 16).

In addition, Bayer argues that it "has put forth evidence to
show that the reason for Plaintiff's termination was the Project

Civil No. 22-1167 (GMM)
Page -7-

Thrive restructuring – a legitimate, nondiscriminatory motive for the action wholly untethered to Plaintiff's pregnancy." (Id. at 17). Bayer asserts that when Badía was informed that one full-time employee position in the Puerto Rico Consumer Health Division had to be eliminated, there were two of those positions under the supervision of Badía. (Id.). That is, one Customer Business Manager and one Manager Customer and Shopper Act Solutions. (Id.). In turn, each of those positions had two incumbents. The two incumbents in the Customer Business Manager position were Omar Figueroa ("Figueroa") and Xiomara Ríos-Pacheco ("Ríos"), and the two incumbents in the Manager Customer and Shopper Act Solutions position were Bilmarie Williams ("Williams") and Casillas. (Id.). According to Bayer, Badía performed and documented an analysis as to which position should be impacted and which one of the two incumbents in that impacted position would be retained. (Id. at 18). Eventually, Badía decided that the Manager Customer and Shopper Act Solutions position should be impacted, based on her evaluation of her division's current and future business needs. (Id. at 18). Further, Bayer posits that Badía's explanation and rationale for deciding to keep Williams in the Manager Customer and Shopper Act Solutions position, over Plaintiff, was based both on overall skills and seniority. (Id. at 19).

Civil No. 22-1167 (GMM)
Page -8-

Bayer also posits that, although Plaintiff alleges pretext, she has not sufficiently established it and has not presented evidence to support the assertion that her performance and job goals surpassed those of Williams. (Id.).

Regarding the discrimination claims under Puerto Rico law, Bayer asserts that it "has met its burden of presenting ample evidence establishing that Plaintiff's termination was not motivated in any way by her pregnancy but rather by the company's Project Thrive restructuring, whereupon the presumption of discrimination disappears." (Id. at 24-25). Specifically, as to Law 3, Bayer states that "Plaintiff has put forth no allegation that 'diminished work performance' as a result of her pregnancy was a factor in her termination." (Id. at 25). Therefore, Bayer requests summary judgment to dismiss Plaintiff's Law 3, 69, and 100 claims. (Id.).

As to the retaliation claims under Title VII and Puerto Rico law, Bayer asserts that Plaintiff cannot demonstrate that she engaged in protected conduct or that a causal connection exists between her protected conduct and termination. (Id. at 26). Furthermore, as to Plaintiff's wrongful discharge claims under Law 80, Bayer posits that Bayer has proven just cause for her termination related to company restructuring or downsizing. (Id. at 27). Hence, Bayer argues that "Law 80 exempts terminations

Civil No. 22-1167 (GMM)
Page -9-

warranted by 'reorganization changes' provided employee retention takes into consideration seniority within the 'employee's occupational classification.'" (Id. at 28).

As to the COBRA claim, Bayer sustains that Plaintiff only alleges that "Defendant failed to comply with its statutorily imposed duty to notify Casillas of her rights under COBRA and consequently violated COBRA's notice requirements." (Id. at 30). To this point, Bayer argues that (i) it is the "plan administrator" who must notify the employee of their COBRA rights and (ii) the evidence does not show that Bayer is the plan administrator. Furthermore, Bayer argues that there is evidence on record of the COBRA notice letter itself as well as a declaration regarding the mailing of the same to Plaintiff's last known address. (Id. at 32).

Lastly, regarding Plaintiff's claims under the Puerto Rico Civil Code, Bayer argues that "when asserting claims for damages predicated on allegations covered by specific employment statutes, plaintiffs are barred from using the same conduct to also bring claims for additional damages under other provisions." (Id. at 33). Also, Bayer posits that the since the Court must dismiss Plaintiff's federal claims it may decline to exercise supplemental jurisdiction over the Puerto Rico law claims. (Id. at 33). In the

Civil No. 22-1167 (GMM)
Page -10-

alternative, Bayer asserts that these claims also fail for the same reasons as their federal law counterparts. (Id.).

On February 5, 2025, Casillas filed *Plaintiff's Response to Defendant's Statement of Uncontested Facts and Statement of Additional Facts Under Local Rule 56(c)* and the *Opposition to Bayer's Motion for Summary Judgment* (Docket Nos. 112; 113). Therein, Plaintiff avers that the uncontested facts and evidence show that (i) on October 2020, Casillas informed Badía she was pregnant; (ii) "Plaintiff's performance evaluations reflected that she was a Strong Contributor, that fully met the requirements of the overall performance during her whole employment with Defendant"; (iii) that Bayer dismissed Plaintiff from her employment while pregnant on January 22, 2021; and (iv) on January 22, 2021, Williams, who was not pregnant, was retained and continued performing the duties of Manager Customer and Shopper Act Solutions. (Docket No. 113 at 5). Plaintiff argues that the first part of the *prima facie* test was met and that since a non-pregnant employee, Williams, was retained in the same position held by Plaintiff, the second part of the test is unnecessary. (Id. at 6).

Further, Plaintiff posits that Bayer's claim that Project Thrive was the reason for her termination is insufficient to rebut the presumption of discrimination. (Id.). Casillas argues that

there is no evidence on record to support that a reduction in force was implemented, and that the evidence only shows that she was the only person Bayer terminated. (Id. at 7). According to Plaintiff, "Project Thrive was announced, began and ended, and Plaintiff was not dismissed prior to the announcement made by the President of Consumer Health North America, Patrick Lockwood-Taylor ("Lockwood-Taylor"), informing that the Project had concluded." (Id. at 12). She posits that it is Bayer that has the burden to establish, through admissible evidence, that there was a mandate to eliminate one full-time employee position in the Puerto Rico Consumer Health Division. (Id. at 12-13). Casillas argues that this burden has not been met and references her deposition and that of Ríos in support. (Id. at 13).

Casillas adds that there is no admissible evidence on the record that supports that Williams surpassed her in skills and seniority, as she posits, they "had the same seniority in the position of Manager, Customer & Shopper Solutions/Activation because they were assigned to the new title when the position was restructured." (Id. at 15). Further, she contends that the record shows that Bayer did not follow the detailed process outlined by the policy and that the decision to terminate her was taken after Project Thrive culminated. (Id.). Casillas contends the Court can infer that the fact she would be on maternity leave was considered

Civil No. 22-1167 (GMM)
Page -12-

in Bayer's decision process. (Id.). In addition, Casillas posits
that Bayer did not meet the required burden of production to
establish a legitimate, nondiscriminatory motive because Bayer's
justification was pretextual. (Id.).

As to the discrimination claims under Puerto Rico law,
Plaintiff argues that since she has established a Title VII
discrimination claim, she also prevails under her state law claims
that derive from the same facts. (Id. at 16-17). Regarding the
wrongful termination claim pursuant to Law 80, Plaintiff
reiterated that Bayer was unable to meet its burden of proof to
establish good cause for her termination. (Id. at 18).

In addition, as to the COBRA claims, Plaintiff posits that
"the identity of the plan administrator is a genuine issue of
material fact and Bayer did not raise such defense nor produced
any evidence regarding this matter". (Id.). Further, Plaintiff
contends that there is no admissible evidence on record that
supports that the COBRA notice letter was in fact sent to her.
(Id. at 19). According to Casillas, despite all the requests she
made, Bayer kept referring her to other departments of the company
and ultimately failed to send her the required notification. (Id.).

As to the retaliation claims both under Title VII and Puerto
Rico law, Plaintiff reiterated that she has indeed met her burden
to establish a *prima facie* case. Also, she reiterated that since

Civil No. 22-1167 (GMM)
Page -13-

she did not accept the Severance Agreement offered by Bayer, she was subject to retaliation. (Id. at 21).

On February 25, 2025, Bayer filed its *Reply to Plaintiff's Response to Defendant's Statement of Uncontested Facts and to Plaintiff's Local Rule 56(C) Additional Fact*. (Docket No. 119). Bayer also filed its *Reply in Support of Bayer Puerto Rico's Motion for Summary Judgment*. (Docket No. 120).

The matter is now fully briefed and ripe for disposition.

## II.   LEGAL STANDARD

### A.   Fed. R. Civ. P. 56

Motions for summary judgment are governed by Federal Rule of Civil Procedure Rule 56. "Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Ramirez-Rivera v. DeJoy, No. 3:21-CV-01158-WGY, 2023 WL 6168223, at *2 (D.P.R. Sept. 22, 2023); *see also* Fed. R. Civ. P. 56(a). At the summary judgment stage of a dispute the Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249(1986); *see also* Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 503 (1st Cir. 2022). A genuine issue of a material fact exists "if the evidence 'is such that a

Civil No. 22-1167 (GMM)
Page -14-

reasonable jury could resolve the point in favor of the non-moving party.'" Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (*quoting* Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)). A fact is material "if it 'has the potential of affecting the outcome of the case.'" Id. (*quoting* Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).

When ruling on a Rule 56 motion, the Court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). In this evaluation, the Court "does not ask which party's evidence is more plentiful, or better credentialled, or stronger." Román v. Hyannis Air Serv., Inc., No. 23-1744, 2025 WL 2693402, at *3 (1st Cir. Sept. 22, 2025) (*citing* Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). "Rather, the rule contemplates an abecedarian, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create any authentic question of material fact." Id.

At this juncture, the Court's role in assessing certain evidence is cabined, as it is well-settled that "[c]redibility

Civil No. 22-1167 (GMM)
Page -15-

determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those
of a judge, whether [s]he is ruling on a motion for summary
judgment or for a directed verdict. The evidence of the non-movant
is to be believed, and all justifiable inferences are to be drawn
in his favor." Mercado Cordova v. Walmart Puerto Rico, Inc., 369
F. Supp. 3d 336, 349 (D.P.R. 2019) (*citing* Anderson, 477 U.S. at
255) (citations and internal quotation marks omitted).

Moreover, the test for summary judgment is applied with the
highest rigor when a disputed issue turns on a question of motive
and intent. "Summary judgment procedures should be used sparingly
. . . where the issues of motive and intent play leading roles .
. . . It is only when the witnesses are present and subject to
cross-examination that their credibility and the weight to be given
their testimony can be appraised. Trial by affidavit is no
substitute for trial by jury which so long has been the hallmark
of 'even handed justice.'" Mejias Miranda v. BBII Acquisition
Corp., 120 F. Supp. 2d 157, 161 (D.P.R. 2000) (*citing* Poller v.
Columbia Broad. Sys., 368 U.S. 464, 470, 473 (1962); *cf.* Pullman-
Standard v. Swint, 456 U.S. 273, 288-90 (1982) (discriminatory
intent is a factual matter for the trier of fact); Dominguez-Cruz
v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000)

Civil No. 22-1167 (GMM)
Page -16-

("[D]eterminations of motive and intent, particularly in discrimination cases, are questions better suited for the jury.")

As a result, "[c]ourts use special caution in granting summary judgment as to intent. Intent is often proved by inference, after all, and on a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party." Id. (citing *In re* Hannon, 839 F.3d 63, 72 (1st Cir. 2016); *see also* Anderson, 477 U.S. at 255).

Nevertheless, the non-movant "must point to competent evidence and specific facts to stave off summary judgment" to overcome a properly supported motion for summary judgment. Tropigas de Puerto Rico v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).

At base, the Court must conclude that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Calderon Amezquita v. Rivera-Cruz, 483 F. Supp. 3d 89, 101 (D.P.R. 2020) (*citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); *see also* Cintron v. Hosp. Comunitario El Buen Samaritano, Inc., 597 F. Supp. 3d 515, 526-27 (D.P.R. 2022) (*citing* Fed. R. Civ. P. 56(c)).

"The party moving for summary judgment has the initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Condado 3 CFL, LLC v. Reyes Trinidad, 312 F. Supp. 3d 255, 258 (D.P.R. 2018) (*quoting* Celotex Corp., 477 U.S. at 323). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (*quoting* DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require us to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ships, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (*quoting* Adria Int'l Grp., Inc., v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)). "Although it is well-settled that the court must decide each motion for summary judgment on its own merits, this does not mean that 'each motion must be considered in a vacuum. Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time,' applying the

Civil No. 22-1167 (GMM)
Page -18-

same standards to each motion." Id. (*quoting* P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 133 (1st Cir. 2010)).

B.   Local Civ. R. 56

Motions for summary judgment are also governed by Local Civil Rule 56. *See* Local Civ. R. 56. "Local Rule 56 is in service to Federal Rule of Civil Procedure 56." López-Hernández, 64 F.4th at 26 (*quoting* Tropigas de P.R., Inc., 637 F.3d at 56). It is an "anti-ferret rule . . . intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." Id.

Pursuant to this Rule, the non-moving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). For facts that are denied, a non-movant's "opposing statement shall support each denial or qualification by a record citation. . ." Id. The non-moving party's opposing statement may also contain "a separate section [of] additional facts, set forth in separate numbered paragraphs and supported by record citation." Id. The moving party may then submit a reply that admits, denies, or qualifies the nonmovant's additional facts through "a separate, short, and concise statement of material facts, which shall be limited to any

Civil No. 22-1167 (GMM)
Page -19-

additional fact submitted by the opposing party" that is supported

by record citation. *See* Local Civ. R. 56(d).

"Under Local Rule 56, a district court is free, in the

exercise of its sound discretion, to accept the moving party's

facts as stated . . . when the statements contained in the movant's

Statement of Uncontested Facts . . . are not properly

controverted." López-Hernández, 64 F.4th at 26; *see also* Ramirez-

Rivera, 2023 WL 6168223, at *2 ("The First Circuit's repeated

admonition on this issue in the last few years, places the Puerto

Rico federal bar on clear notice that compliance with Local Rule

56 is a mandate, not a suggestion.").

### III. ADMISSIBILITY OF EVIDENCE FOR SUMMARY JUDGMENT

Before the Court proceeds to evaluate the cross-motions for

summary judgment, it must first address some matters pertaining to

the admissibility of evidence, as Plaintiff purports the Court to

limit or exclude certain evidence presented by Bayer in support of

for summary judgment. Generally, "only evidence that would be

admissible at trial may be considered in connection with a motion

for summary judgment." Barraford v. T & N Ltd., 988 F. Supp. 2d

81, 84 (D. Mass. 2013) (*citing* Garside v. Osco Drug, Inc., 895

F.2d 46, 49-51 (1st Cir. 1990)). The proponent of the challenged

Civil No. 22-1167 (GMM)
Page -20-

evidence must prove its admissibility. *See* id. The Court will
consider each of Plaintiff's challenges in turn.

A.    Challenges for Hearsay

Casillas moves to strike as inadmissible, the hearsay
statements Badía made in her deposition regarding the reason for
Casillas's termination, particularly those relating to a directive
that was given to Badía from her Bayer USA superior Morante
regarding the implementation in Puerto Rico of the initiative known
as Project Thrive. Specifically, Casillas contests the proposed
fact that "[i]n November or December 2020, Steve Morante
communicated to Badía that as part of Project Thrive one full-time
employee position in the Puerto Rico Consumer Health Division had
to be eliminated." Casillas also contests other related statements
that refer to Morante's directives or requests to Badía. Bayer on
the other hand, argues that Morante's verbal mandate to Badía
regarding Project Thrive is a command not intended as an assertion
and can therefore not constitute inadmissible hearsay.

Hearsay is an out-of-court declaration presented during a
trial or hearing to prove as true the matter asserted. Fed. R.
Evid. 801. For the purposes of hearsay, a declaration may be
written, verbal or otherwise assertive conduct that is intended to
convey a message. Id. Generally, a command is considered non-
assertive verbal conduct because the statement is not made with

Civil No. 22-1167 (GMM)
Page -21-

the intent to declare that something is true or false, but rather, it is a directive to be followed. *See* 30B Jeffrey Bellin, Fed. Prac. & Proc. Evid. § 6726 (2024 ed.). "Out-of-court statements providing directions from one individual to another do not constitute hearsay." United States v. Diaz, 670 F.3d 332, 346 (1st Cir. 2012) (*citing* United States v. Bailey, 270 F.3d 83, 87 (1st Cir. 2001)). "Commands cannot be offered for their truth because they are not assertive speech, that is, propositions that can be proven true or false." Rosado-Mangual v. Xerox Corp., No. CV 15-3035 (PAD), 2019 WL 7247776, at *36 (D.P.R. Dec. 27, 2019) (*citing* United States v. Rodríguez-López, 565 F.3d 312, 314 (6th Cir. 2009) (examining topic)). As such, they are not hearsay - an "out of court statement offered for its truth" — much less inadmissible hearsay. United States v. Keane, 522 F.2d 534, 558 (7th Cir. 1975).

Bayer offered Morante's out-of-court statement to show that this instruction was given, not to prove the truth of the command. Accordingly, Morante's commands to Badía are not hearsay.[1]

---

[1] While the Court finds that the statement is not hearsay, this does not entail that the Court adopts it as true. The facts remain contested, and the Court considers this accordingly in its ruling on the *Motions for Summary Judgments* below.

Civil No. 22-1167 (GMM)
Page -22-

B.    Sham Affidavit

Casillas moves to exclude the *Unsworn Statement under Penalty
of Perjury* signed by Badía on February 4, 2025, and submitted in
support of Bayer's request for summary judgment, under the sham
affidavit doctrine. According to Casillas, the affidavit directly
contradicts the sworn deposition testimony of Badía and relies on
impermissible hearsay.

Under Fed. R. Civ. P. 56(e)(1), an affidavit opposing summary
judgment must "set out facts that would be admissible in evidence."
Affidavits submitted by witnesses who have already been deposed
may be considered by the court when the earlier testimony was vague
but requires explanation for consideration if the earlier
testimony was clear. "A subsequent affidavit that merely explains,
or amplifies upon, opaque testimony given in a previous deposition
is entitled to consideration in opposition to a motion for summary
judgment." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26
(1st Cir. 2002). However, "[w]hen an interested witness has given
clear answers to unambiguous questions, [s]he cannot create a
conflict and resist summary judgment with an affidavit that is
clearly contradictory but does not give a satisfactory explanation
of why the testimony is changed." Colantuoni v. Alfred Calcagni &
Sons, 44 F.3d 1, 4-5 (1st Cir. 1994). To account for an apparent
discrepancy or inconsistency, a "satisfactory explanation for the

Civil No. 22-1167 (GMM)
Page -23-

change is necessary." Coakley Landfill Grp. v. IT Corp., 116 F.
Supp. 2d 237, 243 (D.N.H. 2000) (*citing* Stefanik v. Friendly Ice
Cream Corp., 183 F.R.D. 52, 53-54 (D. Mass. 1998)) (emphasis
omitted). Where the prior answers are those that have been offered
through deposition testimony, the First Circuit has recognized
"that '[a] subsequent affidavit that merely explains, or amplifies
upon, opaque testimony given in a previous deposition is entitled
to consideration in opposition to a motion for summary judgment.'"
Reynolds v. Steward St. Elizabeth's Med. Ctr. of Boston, Inc., 364
F. Supp. 3d 37, 52 (D. Mass. 2019) (*quoting* Gillen, 283 F.3d at
26) (alteration in original).

    An affidavit that is simply "an attempt to manufacture an
issue of fact in order to survive summary judgment" is not
admissible. Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.,
447 F.3d 105, 110 (1st Cir. 2006). To be clear, however, "a clearly
self-serving affidavit constitutes evidence which the court must
consider when resolving summary judgment motions[,]" Malave-Torres
v. Cusido, 919 F. Supp. 2d 198, 204 (D.P.R. 2013), but such an
affidavit "may not contain arguments or conclusory assertions that
would not be admissible at trial. . ." Reynolds, 364 F. Supp. 3d
at 57. In weighing the admissibility of such statements, "personal
knowledge is the touchstone." Perez v. Volvo Car Corp., 247 F.3d
303, 315 (1st Cir. 2001) (citation omitted). Such personal

Civil No. 22-1167 (GMM)
Page -24-

knowledge "must concern facts as opposed to conclusions, assumptions, or surmise[,]" id. at 316, as "[w]ithout any specific factual knowledge to support a statement, it is a mere conclusion that cannot serve as probative evidence." Reynolds, 364 F. Supp. 3d at 57.

After careful review of the affidavit and Badía's deposition transcript, the Court finds that it can consider the affidavit as it does not contradict her testimony during her deposition and merely adds additional detail and context. Moreover, the additional details provided are supported with reference to e-mails and other exhibits, which were either submitted as exhibits during her deposition or in support of both parties' motions for summary judgment.

C.   Authentication and Admissibility of E-mails

Casillas also contests the admissibility of certain e-mails and their attachments. Particularly, Casillas challenges an e-mail sent by Morante to Badía on December 8, 2020, which included as an attachment a spreadsheet template to utilize for the analysis to select the position that was going to be terminated under Project Thrive.

It is well settled that "[d]ocuments supporting or opposing summary judgment must be properly authenticated." Del Toro Pacheco v. Pereira Castillo, 662 F. Supp. 2d 202, 210 (D.P.R. 2009). In

Civil No. 22-1167 (GMM)
Page -25-

order to satisfy the authentication requirement "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). One way to satisfy this requirement is with witness testimony saying "that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). Additionally, "[e]-mails can be authenticated by their authorship. . .[and] data such as the address of the original sender the content of the information included in the e-mail and other circumstances can [also] suffice." Sánchez-Medina v. Unicco Svc. Co., Civil No. 07-1880(DRD), 2010 WL 3955780, at *5 (D.P.R. Sept. 30, 2010) (slip copy).

Here, the December 8, 2020 e-mail, which is attached to Badía's affidavit, was addressed to Badía and she responded to the e-mail herself, a minute later. *See* (Docket No. 110-2). Badía refers to the e-mail throughout the course of her affidavit and certifies it as the of the e-mail she wrote or received. This is sufficient for authentication purposes.

Similarly, the e-mail is attached to Badía's deposition transcript and was shown to her during his deposition. For this reason, it is listed as Exhibit No. 9 in the deposition transcript. *See* (Docket No. 96-4 at 4, 68-69; 110-2). At the deposition, counsel for Plaintiff introduced the copy of the e-mail and described its contents as well as those of the spreadsheet

Civil No. 22-1167 (GMM)
Page -26-

attached. (Docket No. 96-4 at 68-69). Badía asserted that she had received and read that e-mail previously, and she confirmed its contents. (Id. at 46-48). Accordingly, the e-mail was marked as an exhibit. (Id. at 68). This is sufficient to satisfy the requirements of Federal Rule of Evidence 901. *See* Navedo v. Nalco Chem., Inc., 848 F. Supp. 2d 171, 202 (D.P.R. 2012).

In the same manner, Plaintiff introduced a series of e-mails as exhibits to support her motion for summary judgment. See (Docket Nos. 96-10; 96-18; 96-19; 96-24; 96-25; 96-28; 96-29; 96-30). She also introduced those e-mails as exhibits during the depositions that took place in this case. Under Federal Rule of Civil Procedure 32(a)(3), "exhibits to a deposition may be admitted at trial if admissible under the rules of evidence." Amarin Plastics, Inc. v. Md. Cup Corp., 946 F.2d 147, 153 (1st Cir. 1991). Based on its review of the transcripts of the depositions, the Court finds there is a sufficient foundation to authenticate the e-mails as well as the referenced attachments, the spreadsheets, and thus finds them admissible for summary judgment purposes.

D.   Motion to Strike Fidelity's Custodian of Records' Declaration

On February 25, 2025, Casillas filed a *Motion to Strike* requesting the Court to preclude Bayer from using the proposed Exhibit 14 submitted in support of Bayer's Motion for Summary Judgment and its *Opposition to Plaintiff's Motion for Summary*

Civil No. 22-1167 (GMM)
Page -27-

*Judgment*. (Docket No. 121). Exhibit 14 consists of an unsworn declaration under penalty of perjury subscribed on September 10, 2025, by Sabrina Otero, Fidelity's custodian of records. First, Casillas requests the exclusion of the declaration under Federal Rules of Civil Procedure 26(a)(1) and 37(c)(1). To that extent, Plaintiff alleges that on September 10, 2024, the date set by the Court as deadline to complete discovery, Bayer informed Plaintiff of its intention to include in its list of witnesses a "Fidelity custodian" of records "for the purposes of authentication of the referenced documents," referring to copies of a COBRA Mailing Kit attached to a batch 33 COBRA Notices, including the one addressed to Casillas. (Id. at 3); (Docket No. 119-2; 138-1 at 2). Plaintiff further states that parties had agreed that Plaintiff would not contest this issue if the custodian would be announced for the sole purpose of authenticating the documents. However, Plaintiff contends that despite the agreement, on December 5, 2025, Bayer filed its Motion for Summary Judgment and submitted Mrs. Otero's declaration with a statement that went beyond that scope. According to Plaintiff, the declaration should be excluded because of Mrs. Otero's statement that "the attached COBRA mailing kit dated April 28, 2021, was sent to Plaintiff by U.S. mail." Plaintiff contends that this testimonial fact was not disclosed during discovery and

Civil No. 22-1167 (GMM)
Page -28-

that Bayer failed to comply with its duty to supplement the initial
disclosures.

Second, Casillas requests the exclusion of Mrs. Otero's
declaration as inadmissible hearsay. Casillas argues that the
statement does not fall within an exception to the general hearsay
rule of inadmissibility, because: (1) Mrs. Otero "does not testify
to have personal knowledge of the matters recorded to make the
record or to transmit the information included in the record";
Mrs. Otero "does not testify have [sic] personal knowledge
regarding the claimed mailing of the 'COBRA Notice' to Plaintiff";
she "does not testify have [sic] personal knowledge of the
statement and does not identify the alleged employee or
representative that allegedly has knowledge regarding the claimed
matters" and "there is no certification or document to confirm
that Otero does work for Fidelity, and . . . that she worked for
Fidelity at the time relevant to the act, to be able certify the
regular activity claimed." (Id. at 9).

In response, on March 11, 2025, Bayer filed an *Opposition* to
*Plaintiff's Motion in Limine*. (Docket No. 132). Therein, Bayer
argues that as part of the cross-summary judgment briefing it
submitted evidence of compliance with the COBRA notice.
Specifically, a "copy of a batch of COBRA notice letters (including
the notice letter addressed and sent to Plaintiff) along with cover

Civil No. 22-1167 (GMM)
Page -29-

pages reflecting that they were sent by U.S. Mail by third party
entity [Fidelity]." (Id. at 2). Bayer concedes that the "Otero
Affidavit is intended solely as an authentication affidavit.
Insofar as any portion of the Otero Affidavit could be deemed to
go beyond the scope of authentication of the COBRA Mailing Kit,
Bayer Puerto Rico acquiesces to that portion of the affidavit being
disregarded." (Id. at 3). In addition, Bayer argues that "[t]here
is no requirement in Rule 56 nor related caselaw that a party must
first produce a declaration through discovery before submitting it
in support or opposition to a motion for summary judgment." (Id.
at 4). Further, Bayer contends that Plaintiff had ample opportunity
to pursue discovery from Fidelity and opted against it. As to the
hearsay argument, referring to its summary judgment briefing,
Bayer reiterates that the declaration "is not offered to prove the
truth of any matter asserted therein; but rather simply for
authentication purposes of the COBRA mailing kit." (Id. at 4 n.2;
119 at 17). Also, that for authentication purposes the declaration
identifies Mrs. Otero's "position of authority and states that the
copy of the COBRA [M]ailing [K]it attached to the affidavit is a
true and correct copy of the one in the business records of
[Fidelity]." On March 13, 2025, Plaintiff filed a *Reply to
Defendant's Opposition to Plaintiff's Motion In Limine* and

Civil No. 22-1167 (GMM)
Page -30-

reiterated her arguments in support of preclusion. (Docket No. 135).

First, the Court addresses the matter of authentication. As reflected in the parties' cross-summary judgment briefings, the issue surrounding the COBRA Mailing Kit is not authenticity but rather whether there is sufficient evidence that the "Notice of Rights to Elect Continuation of Group Health Coverage" was duly mailed to Plaintiff's postal address. In support of the fact that the COBRA notice was effectuated, Bayer submitted a copy of a COBRA Mailing Kit comprised of a batch of a "Banner Page" and thirty-three COBRA notices, including one directed at Casillas. The Court notes that a copy of the COBRA notice addressed to Casillas was also included as an exhibit in support of *Plaintiff's Motion for Summary Judgment*. (Docket No. 96-35). A side-by-side review of the documents reflects that the Assembly Code (4.BI-H-700A) and CM Output Batch (4289968) in the Banner Page of all the notices included in the mailing kit match those in the COBRA notice addressed to Casillas. (Docket Nos. 96-35; 119-1).

To authenticate both the COBRA Mailing Kit including the batch of the thirty-three COBRA notices and the COBRA notice addressed to Casillas, Bayer submitted Mrs. Otero's declaration under penalty of perjury. Mrs. Otero's declaration states: (1) that she is the Senior Client Service Manager of Fidelity; (2) that her

Civil No. 22-1167 (GMM)
Page -31-

duties include serving as a custodian of records for Fidelity; (3)
that the COBRA mailing kit attached to the declaration "is a true
and correct copy of the COBRA mailing kit date April 28, 2021" as
well as the "corresponding batch file"; (4) that the records "are
kept in the regular course of Fidelity's business"; (5) that "it
was in the regular course of Fidelity's business for an employee
or representative with knowledge of the matters recorded to make
the record or to transmit the information to be included in such
record" and (6) "that the record was made at or near the time of
the acts, conditions or events recorded." *See* (Docket Nos. 100-
14; 119-1).

Rule 56(c)(2) requires "nothing more" than "an unsworn
declaration under penalty of perjury" to authenticate certain
business records. Francis v. Caribbean Transp. Ltd., 882 F. Supp.
2d 275, 278-79 (D.P.R. 2012). Under Federal Rule of Evidence
803(6), if a record was kept in "the course of a regulatory
conducted activity of business," the condition can be shown by the
testimony of a custodian or by a certification. Fed. R. Ev. 803(6).
"Any person in a position to attest to the authenticity of certain
records is competent to lay the foundation for the admissibility
of the records." Alemany Ramirez v. ICF Inc., LLC, No. CV 24-01033
(FAB), 2025 WL 1360700, at *1 (D.P.R. May 9, 2025) (*quoting*
Rosenberg v. Collins, 624 F.2d 659, 665 (5th Cir. 1980).

Civil No. 22-1167 (GMM)
Page -32-

Furthermore, "[t]he business-records exception removes the hearsay
bar for records kept in the course of a regularly conducted
business activity if making the records is a regular practice of
that business activity, so long as 'neither the source of
information nor the method or circumstances of preparation
indicate a lack of trustworthiness.'" Cosme-Montalvo v. Trafon
Grp., Inc., No. CIV. 11-2197 MEL, 2013 WL 1728577, at *2 (D.P.R.
Apr. 22, 2013) (citing Jordan v. Binns, No. 11-2134, 2013 WL
1338049, at *10 (7th Cir. Apr.4, 2013); Fed. R. Evid. 803(6)).

Although, Casillas questions the source of the information
and the method or circumstances of preparation of the COBRA Mailing
kit in a conclusory fashion, she has asserted no reason to infer
that "[ ]either the source of information [ ]or the method or
circumstances of preparation indicate[s] a lack of
trustworthiness." Fed. R. Evid. 803(6)(E).

In light of the above, the Court finds that Mrs. Otero's
declaration should not be subject to the severe exclusionary rule
of Rules 26(c)(1) and 37(c)(1). First, it shall not be stricken
from the record "a[ ] custodian of records does not need to be
disclosed as part of initial disclosures." Alemany Ramirez, 2025
WL 1360700, at *1. Second, since the commencement of this action
and throughout the discovery period Bayer anticipated it would
call as a witness at trial a custodian of records from Fidelity,

and Plaintiff was well aware of this. To this extent, Plaintiff had even conceded to the utilization of Fidelity's custodian of record for the purposes of authentication.

Moreover, Mrs. Otero's declaration is valid to authenticate records kept in the regular course of Fidelity's business. The Court also finds that the documents referred to as the COBRA Mailing Kit are admissible because Bayer provided a declaration, (Docket No. 100-14), from Fidelity's custodian of business records, verifying the authenticity of the documents under penalty of perjury. *See* Fed. R. Evid. 803(6), 902; *see also* Colon-Fontanez v. Mun. of San Juan, 660 F.3d 17, 30 n. 13 (1st Cir. 2011) (noting that there was no error in considering statements for a motion for summary judgment when the custodian of the records submitted an affidavit confirming the reliability of the records).

However, Mrs. Otero's statement authenticating the COBRA mailing kit dated April 28, 2021, states that it was sent by U.S. mail to Casillas. Bayer admitted that the affidavit from Mrs. Otero, was intended solely for authentication of the COBRA Mailing Kit and that anything that goes beyond the scope can be disregarded. (Docket No. 132). Accordingly, the portion of the affidavit that claims the COBRA notice was mailed to Plaintiff shall be stricken from the record and the related statement in

Civil No. 22-1167 (GMM)
Page -34-

paragraph number 87 of *Defendant's Statement of Uncontested Facts*
will be disregarded. (Docket No. 100 at 7).

At this juncture, the Court will consider the affidavit from
Mrs. Otero solely for authentication purposes. *See* Fed. R. Evid.
901; U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr.
v. Jones, 925 F.3d 534, 540 (1st Cir. 2019).

Consequently, the Motion to Strike is **GRANTED IN PART AND
DENIED IN PART.**

## IV.    UNCONTESTED FACTS

The Court examined Plaintiffs' *Statement of Uncontested
Material Facts* ("*SUMF*") (Docket No. 96-2); Bayer's S*tatement of
Uncontested Facts* (Docket No. 100); Bayer's *Opposition to
Plaintiff's Statement of Uncontested Facts and Bayer Puerto Rico's
Local Rule 56(C) Additional Facts.* (Docket No. 110); *Plaintiff's
Response to Defendant's Statement of Uncontested Facts and
Statement of Additional Facts under Local Rule 56(c)* (Docket No.
112); Bayer's *Reply to Plaintiff's Response to Defendant's
Statement of Uncontested Facts and to Plaintiff's Local Rule 56(c)
Additional Facts* (Docket No. 119); Plaintiff's *Reply to
Defendant's Opposition to Plaintiff's Statement of Uncontested
Facts and Response to Defendant's Statement of Additional Facts
under Local Rule 56(c)* (Docket No. 124); and *Plaintiff's Reply to*

Civil No. 22-1167 (GMM)
Page -35-


*Defendant's Statement of Additional Facts under Rule 56(c) [Docket*

*No. 110)]* (Docket No. 131).

    After crediting only material facts supported by admissible

and accurate record citations, the Court finds the following

material facts are not in dispute:

    1.    On October 11, 2011, Casillas began working at
Merck Consumer Care ("Merck") (Docket Nos. 96-2 ¶
1; 100 ¶ 1; 110 ¶ 1).

    2.    Casillas held the position of Customer Business
Manager. (Docket Nos. 96-2 ¶ 2; 100 ¶ 1; 100-1 at
4; 110 ¶ 2).

    3.    In October 2014, as a result of the acquisition of
the Merck Consumer Care Division, Plaintiff became
an employee of Bayer. (Docket Nos. 100 ¶ 2; 100-1
at 5).

    4.    When Casillas became the Manager Customer and
Shopper Act Solutions at Bayer in March 2015, she
retained her seniority dating back to October 2011
with Merck. (Docket Nos. 96-2 ¶ 5; 100 ¶ 4; 100-1
at 5; 110 ¶ 5).

    5.    Badía works at Bayer as Sales and Marketing
Manager, a position that she held between October
2020 and January 2021. (Docket Nos. 96-2 ¶ 8; 100
¶ 9; 100-3 at 3-4; 110 ¶ 8).

    6.    In October 2020, Badía supervised Williams, Ríos,
Figueroa and Casillas. (Docket Nos. 96-2 ¶ 9; 96-4
at 10; 110 ¶ 9).

    7.    Badía reports to Morante. (Docket Nos. 96-2 ¶ 10;
96-4 at 10; 110 ¶ 10).

    8.    Darin Rodríguez-Wells Torres ("Rodríguez-Wells")
worked as Human Resources Site Lead for Juana Diaz
("Human Resources Lead"), Puerto Rico from October

Civil No. 22-1167 (GMM)
Page -36-

> 2020 to January 2021. (Docket Nos. 96-2 ¶ 11; 96-5 at 11; 110 ¶ 11).

9.    Nydia Acevedo Cardé ("Acevedo-Cardé") worked at Bayer, and from October 2020 to January 2021 was Bayer's Managing Director. (Docket Nos. 96-2 ¶ 12; 96-6 at 9; 110 ¶ 12).

10.    Casillas and Williams had the same job description. (Docket Nos. 96-2 ¶ 26; 96-4 at 40; 110 ¶ 26).

11.    The title Manager, Customer and Shopper Solutions had the following required skills/abilities:

- Category/Marketing plan development and creative execution expertise
- Experience with CPG brand management including media selection and creative development
- Ability to think creatively and foster innovation
- High level of urgency and prioritization, with understanding of strategic selling
- Knowledge of market research process and experience with leveraging insights to create solutions
- Awareness of data analytical tools and interpretation
- Financial acumen to manage spending and marketing budget
- Ability to devise and deliver persuasive presentations and influence at various levels within the organization and to the retailer
- Strong computer skills, including MS Office, database information, and web applications

(Docket Nos. 96-2 ¶ 27; 96-11; 110 ¶ 27).

12.    Bayer's performance evaluation for Casillas in 2018 reflects the following:
- Job Performance: Fully Meets Expectations;
- Life – Leadership: Exceeds Expectations;

- Life – Integrity: Fully Meets Expectations;
- Life – Flexibility: Fully Meets Expectations;
- Life – Efficiency: Fully Meets Expectations;
- Life – Performance: Fully Meets Expectations; and
- Overall Performance: Fully Meets Expectations

(Docket Nos. 96-2 ¶ 28; 96-12; 110 ¶ 28).

13. Bayer's performance evaluation for Casillas in 2018 contains the following statements:

> [Casillas] has worked during the first half of 2018 intensively managing his [sic] Brands. Overall business is 12% above plan through the first half of 2018. [Casillas] brands performance in general are -1.5% below plan, mostly due to Coppertone performance. Claritin and Nutritional segments are performing very positive. Annual BTS event project timely presented and ready, she encouraged CBM's for a better commitment from customers; nonetheless, good volume was generated by the promo. [Casillas] is a very valuable resource for the division and consistently is developing his [sic] strategic planning for brands under her responsibility. Brokers business uptake has been possible mainly for [Casillas's] support and direct supervision of initial business issues in collaboration with [Williams].

> [Casillas] is a strong member of Bayer PR team and my intention is to continue developing her leadership capabilities through trainings and special projects.

(Docket Nos. 96-2 ¶ 29; 96-12 at 6-7; 110 ¶ 29).

14. Bayer's performance evaluation for Casillas in 2019 reflects the following: "Strong Contribution." (Docket Nos. 96-2 ¶ 30; 96-13 at 3; 110 ¶ 30).

15. Bayer's performance evaluation for Casillas in 2019 contains the following statements:

> [Casillas] is a valued key person in the PR team. She is proactive and always looks for further business opportunities. Continued support to CBM by developing of innovative programs: secondary placements, special promotions (BTS Promo), among others. During 2019 [Casillas] supported management with Coppertone divestiture transition, providing training, knowledge transfer and helped with administrative duties. She took responsibility and kept management of Brokers incentive program during the year and worked directly with the finance team.
>
> (Docket Nos. 96-2 ¶ 31; 96-13 at 3; 110 ¶ 31).

16. Bayer's performance evaluation for Casillas in 2020 reflects the following: "Strong Contribution." (Docket Nos. 96-2 ¶ 32; 96-14 at 3; 110 ¶ 32).

17. At the time of Casillas's termination, Bayer USA's "HR Policies" include Section 2.17 on "Staff Reductions" ("Staff Reductions Policy") which established a procedure for staff reductions, specifically stating that: "[t]he company may decide to reduce its work force because of business conditions, reorganization, reassignments or reducing or phasing out certain operations" and that "[w]hen a reduction in staff becomes necessary" certain steps shall occur. (Docket Nos. 96-2 ¶ 39; 96-4 at 43-44; 96-16; 100 ¶ 49; 110 ¶ 39).

18. According to Section 2.17 of the Staff Reductions Policy:

> When a reduction in staff becomes necessary, the following shall occur:

Civil No. 22-1167 (GMM)
Page -39-

**Identify Positions to be Impacted:**
Generally, the business reasons for a
reduction in force will suggest which
positions are likely to be impacted. At
this step of the procedure, the focus
should be on positions or functions, and
not on specific individuals.

**Consider Elimination of Temporary
Contract Personnel:** If business
conditions permit, consider the
termination of temporary and contract
personnel at the impacted site in an
attempt to minimize the impact of staff
reductions on the regular work force.
(This may not be feasible at sites and
departments where contractors and
temporary personnel perform technical
work, such as engineering, and where the
business requires their retention.)

**Determine which Job(s) will be
Eliminated:** In situations where a
particular function or job will no longer
be performed following the reduction, the
incumbent in that job will be impacted by
the reduction, regardless of
considerations of skills, performance
and seniority. Bumping of incumbents who
are in jobs not impacted by the reduction
should not be permitted in such
situations.

**Make Selection(s) Among Incumbents in
Impacted Jobs:** An individual is
considered an incumbent if his or her job
changes less than twenty percent as a
result of the reorganization. Where fewer
individuals are required to perform an
ongoing function than there are
incumbents currently performing that
function, it is necessary to select which
employees will be retained. The selection
will be made by comparing, in this order
of preference, (1) required skills; (2)
if skills are equal, documented

<u>performance; and (3) if skills and performance are equal, company length of service.</u>

(Docket Nos. 96-16 at 1; 100 ¶ 51; 112-1 ¶ 52) (bold in the original, underline added).

19.    According to Section 2.17 of the Staff Reductions Policy:

[r]educing staff requires review by the Human Resources and Law Departments and must be approved by the senior management or the authorized designee of the impacted business unit and/or division. The company's reduction-in-force review team must review proposed reductions in force for the purposes of ensuring compliance with this practice and evaluating legal risks associated with the proposed reductions prior to any individual notifications being communicated.

(Docket Nos. 96-2 ¶ 40-41; 96-16 at 2; 110 ¶ 40-41).

20.    Section 2.17 on "Staff Reductions" also establishes that: "Where fewer individuals are required to perform an ongoing function than there are incumbents currently performing that function, it is necessary to select which employees will be retained. The selection will be made by comparing, in this order of preference, (1) required skills; (2) if skills are equal, documented performance; and (3) if skills and performance are equal, company length of service." (Docket Nos. 96-2 ¶ 42; 96-16 at 1; 110 ¶ 42).

21.    On October 2, 2020, Bayer USA announced the implementation of Project Thrive. At that time, no express information was provided regarding any reduction in force to be carried out in Puerto Rico. (Docket Nos. 96-2 ¶ 14; 96-4 at 40; 96-6 at 17; 100-2 at 9; 110 ¶ 14).

Civil No. 22-1167 (GMM)
Page -41-

22. Project Thrive was designed by Bayer's President, Consumer Health North America, Lockwood-Taylor. (Docket Nos. 96-2 ¶ 15; 96-4 at 41; 110 ¶ 15).

23. The objective of Project Thrive was to implement changes in the Consumer Health company in North America to continue to grow Bayer's business by investing in areas that will drive strategic advances in the future, in part through streamlining operations and cutting positions. (Docket No 96-9 at 1).

24. Badía, Rodríguez-Wells, Acevedo-Cardé, Williams, and Ríos did not participate in the design or development of Project Thrive. (Docket Nos. 96-2 ¶ 17; 96-4 at 41; 96-5 at 36; 96-6 at 18; 96-7 at 12;96-8 at 12; 110 ¶ 17).

25. Project Thrive initiated in October 2020 and would be implemented by the end of 2020. (Docket Nos. 1 ¶ 21; 9 ¶ 21; 96-2 ¶¶ 14, 18).

26. On October 13, 2020, Casillas informed Badía that she was pregnant. (Docket Nos. 96-2 ¶ 13; 96-6 at 51; 100 ¶ 7; 110 ¶ 13).

27. On November 19, 2020, Lockwood-Taylor sent an e-mail addressing a personal announcement as to the Chief Customer Officer, Senior Vice President and consolidation of positions where he referenced Project Thrive's strategic goals, without reflecting any changes as to Puerto Rico´s workforce.[2] (Docket Nos. 1 ¶ 23; 96-2 ¶ 19; 96-9; 110 ¶ 19; 112-1 ¶ 18).

28. As of November 2020, Badía's direct superior was Morante, Vice President of Sales for Bayer USA. (Docket No. 96-4 at 10).

---

[2] There is a reference to a town hall meeting recording, but the Court does not have access to that recording. As such, the Court cannot consider its contents.

Civil No. 22-1167 (GMM)
Page -42-

29. As of December 2020, Badía had two full-time
    employee positions under her supervision at Bayer:
    that of Customer Business Manager and Manager
    Customer and Shopper Act Solutions. (Docket No. 96-
    4 at 48-49).

30. As of December 2020, the two incumbents in the
    Customer Business Manager position were Figueroa
    and Ríos, and the two incumbents in the Manager
    Customer and Shopper Act Solutions position were
    Williams and Casillas. (Docket No. 96-4 at 10; 96-
    6 at 46-47).

31. As of December 2020, Williams had more seniority at
    Bayer than Casillas. (Docket Nos. 96-3 at 37; 96-4
    at 64-65; 96-7 at 23-24; 100 ¶ 49; 112-1 ¶ 49).

32. Morante was in charge of communicating information
    regarding Project Thrive to the business unit in
    Puerto Rico. Badía communicated with Casillas and
    other supervisees about Project Thrive. (Docket No.
    112-1 at 6 ¶ 21).

33. Casillas received an e-mail regarding the order of
    a new "Company-car" to be assigned to her for the
    year 2021. (Docket Nos. 96-2 ¶ 22; 96-37; 110 ¶
    22).

34. Badía had knowledge that in December 2020 Casillas
    was in the process of acquiring a company car. She
    needed to approve the order for company cars in the
    Consumer Health area. (Docket Nos. 96-2 ¶ 23; 96-
    37; 110 ¶ 23).

35. On December 1, 2020, Badía sent an e-mail to all
    the employees under her supervision, including
    Casillas, indicating that it was time for year-end
    self-assessment and check-in. Casillas responded to
    this e-mail on December 10, 2020, indicating that
    she had completed her results on the system and
    asking Badía if she wanted to meet on that day.
    Badía thanked Plaintiff and replied: "I will keep
    you informed." (Docket Nos. 96-2 ¶ 24; 96-4 at 37-
    38; 110 ¶ 24; 116-1).

Civil No. 22-1167 (GMM)
Page -43-

36. On December 7, 2020, Badía held a videoconference with Morante via Microsoft Teams. (Docket No. 110-1 at 2 ¶ 9).

37. On December 8, 2020 at 8:47 am, Badía sent an e-mail to Morante with the subject "2020 PuertoRicoSlate.xlsx" asking: "Is this the template to use for the process?" (Docket No. 110-2 at 2).

38. On December 8, 2020 at 10:21am, Morante responded to Badía's e-mail with the subject "2020 PuertoRicoSlate.xlsx": "There is a simpler one. Will send to you." (Docket No. 110-2 at 1).

39. Spreadsheets attached to these e-mails contained information regarding the following : "Specific Skills/Competencies"; "Education Level/Branch of Study"; "Total Relevant Experience"; "Service Years"; "2018 Perf. Rating"; "2019 Perf. Rating"; "Supervisor"; and "Comments". 2020 performance ratings were not included in this spreadsheet.(Docket No. 96-2 ¶ 53; 110-3 at 6).

40. Only Badía performed an analysis of the performance reviews of Casillas and Williams to make the final decision as to which position would be impacted by Project Thrive and which of the two incumbents would be retained. (Docket Nos. 96-2 ¶ 62; 96-4 at 58; 110 ¶ 62).

41. Rodríguez-Wells' role was to process all documents, approvals and next steps after Badía made the decision as to which position would be impacted by Project Thrive. (Docket Nos. 96-2 ¶ 63; 96-4 at 54; 110 ¶ 63).

42. Rodríguez-Wells did not review the performance evaluations of Casillas or Williams. (Docket Nos. 96-2 ¶ 65; 96-4 at 40; 110 ¶ 65).

43. Badía consulted with Rodríguez-Wells whether there were "any additional considerations in ·addition to the policies and this law she must ·consider in addition to reviewing company policies", specifically "if there was any consideration for

anyone who was pregnant." (Docket No. 96-5 at 59-61).

44. Rodríguez-Wells informed Badía that, under Puerto Rico labor law, pregnancy could not be factored for or against an employee in termination decisions. She further explained that the company was legally bound to follow mandatory criteria such as seniority, which could not be disregarded under local law. (Docket No. 96-5 at 59-61).

45. On December 14, 2020 at 4:07 pm, Badía sent an e-mail to Morante stating in relevant part "[f]or your reference and evaluation, attached please find Slate template and rationale for the PR Project Thrive." (Docket Nos. 96-2 ¶ 73; 110 ¶ 73; 110-1 at 3 ¶ 11; 110-3 at 1).

46. Badía's December 14, 2020 4:07 pm e-mail to Morante included as an attachment a filled out "slate template" as to the categories. (Docket No. 96-4 at 45; 100-7; 100-9).

47. Badía's December 14, 2020 4:07 pm e-mail to Morante also included as an attachment a "Position Slate Rationale" which stated the following:

> **2020 Project Thrive**
>
> **Position Slate Rationale**
>
> **Business case:** Puerto Rico CH Team provides direct sales and marketing service to National & Local customers. We also managed locally all trade activations, consumer promotions and advertising planning, development and execution. The CH Team is comprised of 2 CBMs and 2 Customer Activations/Shopper Managers; based on the current and future business needs my recommendation is to slate 1 Customer Activations/Shopper Manager position.

> (Docket Nos. 96-4 at 71-73; 100-11)
> (emphasis in original).

48. The spreadsheet, dated December 10, 2020, in the column entitled "Specific Skills/Competencies" states the following as to Williams:

> "[Williams] has an exceptional ability to handle administrative needs and effectively support matters at the managerial level. Effective understanding and management of inventory, obsolescence, forecasting, and Budget planning issues. Excellent customers relationship, understanding of trade dynamics and negotiation skills."
>
> (Docket Nos. 96-2 ¶ 74; 96-18 at 6; 110 ¶ 74).

49. The spreadsheet, dated December 10, 2020, in the column titled "Comments" states the following as to Williams:

> "[Williams] is a complete and well rounded Team player. She has been identified as a potential successor for PR Division Manager position."
>
> (Docket Nos. 96-2 ¶ 75; 96-18 at 6; 110 ¶ 75).

50. The spreadsheet, dated December 10, 2020, in the column entitled "Specific Skills/Competencies" states the following as to Casillas:

> "[Casillas] has demonstrated an excellent ability to manage brands under her responsibility. Her experience in advertising and her previous role in sales, yields the developed [sic] of innovative programs. She is very organized and maintains excellent relationship with customers and suppliers."

(Docket Nos. 96-2 ¶ 74; 96-18 at 6; 110 ¶ 74).

51. The spreadsheet, dated December 10, 2020, in the column titled "Comments" states the following as to Casillas:

"[Casillas] was a great addition to the Team after Legacy Merck integration, her expertise with Coppertone makes possible the rapid and continued brand support, and divestiture process as well."

(Docket Nos. 96-2 ¶ 75; 96-18 at 6; 110 ¶ 75).

52. Badía discussed the spreadsheet with Rodríguez-Wells, who expressed her opinion regarding the importance of considering seniority, in addition to skills and competencies, in deciding which employee to retain. (Docket Nos. 96-2 ¶ 69; 96-4 at 76; 110 ¶ 69).

53. On December 14, 2020, at 4:50 pm, Morante responded to Badía: "Hi. I didn't see the slate ratings/explanations here. How are you choosing which shopper candidate to keep?"(Docket Nos. 96-2 ¶ 76; 96-18 at 13-14; 110 ¶ 76).

54. On December 14, 2020, at 5:03 pm, Badía replied: "The person to be slate is Jenniffer Casillas. In the top line of the excel spreadsheet is detailed. In conversation with [Rodríguez-Wells], she suggest[ed] to use seniority in the equation too. If you want we can discuss it briefly."

(Docket Nos. 96-2 ¶ 76; 96-18 at 13-14; 110 ¶ 76).

55. On December 14, 2020, at 5:05 pm, Morante wrote: "So [Casillas's] position is being eliminated? To which Badía responds: "Yes." (Docket Nos. 96-2 ¶ 76; 96-18 at 13-14; 110 ¶ 76).

56. On December 14, 2020, at 5:11 pm, Morante expressed to Badía: "I am not reading what separates the two.

What specifically makes [Williams] the choice?"
(Docket Nos. 96-2 ¶ 77; 96-18 at 8-9; 110 ¶ 77).

57. On December 14, 2020, at 7:04 pm, in reply, Badía
    sent Morante an "updated slate template," that
    included the following statement in the section of
    Comments with regards to Williams:

> My recommendation is to retain Bilmarie
> Williams in the organization based on the
> following assessment. [Williams] has
> more experience in day to day management
> in the organization, providing a more
> agile response to business future needs.
> She understands being the only marketing
> resource within the team and is capable
> of successfully prioritize market and
> business needs. She can manage and
> support operational roles of a CBM
> functions as well. She is a results
> oriented manager and negotiates
> effectively with AMG Brokers account.
> [Williams] is a complete and well rounded
> Team player. She has been identified as
> a potential successor for PR Division
> Manager position.

> (Docket Nos. 96-2 ¶ 78; 96-4 at 71; 96-
> 18 at 10; 96-19 at 2; 100-9 at 1; 112-1
> ¶ 44; 110 ¶ 78).

58. The template also included updates to the "Specific
    Skills/Competencies" section with regards to
    Williams:

> "[Williams] has an exceptional ability to
> handle administrative needs and
> effectively support matters at the
> managerial level. Effective
> understanding and management of
> inventory, obsolescence, forecasting,
> and Budget planning issues. Demonstrate
> Customer Focus behavior by developing
> customers trust and, thoughtful of trade
> dynamics and negotiation skills."

(Docket Nos. 96-2 ¶ 78; 96-4 at 71; 96-18 at 10; 96-19 at 2; 100-9 at 1; 112-1 ¶ 44; 110 ¶ 78).

59. On or about the same time, an update rationale document was shared:

**2020 Project Thrive**

**Position Slate Rationale**

**Business case:** Puerto Rico CH Team provides direct sales and marketing service to National & Local customers. We also managed locally all trade activations, consumer promotions and advertising planning, development and execution. The CH Team is comprised of 2 CBMs and 2 Customer Activations/Shopper Managers; based on the current and future business needs my recommendation is to slate 1 Customer Activations/Shopper Manager position.

My recommendation to retain Bilmarie Williams in the organization is based on seniority in the position. [Williams] also have [sic] more experience in the day to day management in the organization, providing a more agile response to business future. She understands being the only marketing resource within the team and is capable of successfully prioritize [sic] market and business needs. She can manage operational roles of a CBM functions as well. She has also developed an excellent relationship with the Brokers customers.

(Docket Nos. 100-11; 110-8)

60. On December 15, 2020 at 10:18 am, Jane Juhng ("Juhng from HR Bayer USA"), Director for HRBP Consumer Health at Bayer USA sent an e-mail to Rodríguez-Wells with the subject "Puerto Rico Project Thrive" and an attachment titled "2020 Slate Template Puerto Rico" stating the following: "Hi. [Rodríguez-Wells]. [Morante] sent this to me. Have you had a chance to review and move forward with

legal review? [Morante] wasn't sure where we were in the process." (Docket No. 96-19 at 1).

61. On January 7, 2021, Rodríguez-Wells sent an e-mail to Badía informing about the talking points received from Juhng from HR Bayer USA. (Docket No. 96-5 at 106-07).

62. On January 22, 2021, Badía and Rodríguez-Wells informed Casillas that she would be terminated during a meeting. (Docket No. 96-3 at 124; 96-5 at 29-32).

63. The "talking points" state in relevant part:

> As you are aware, we have engaged in a strategic review of the Consumer Health business in North America – Project Thrive . . . Before we dive into the changes, I think it is important to revisit the intent of Project Thrive. This work strategically positions our business to win in the coming years and become the Best Consumer Health company in North America. Building upon the great progress that we have made over the past two years, the strategic intent behind Project Thrive is to position our business for future success and invest in areas that will drive strategic advantage.
>
> (Docket No. 96-23 at 1).

64. Plaintiff's employment with Bayer was terminated effective April 23, 2021, according to the termination letter dated January 22, 2021. (Docket No. 96-26 at 19).

65. During Casillas's deposition, she admitted that no one told her she was being terminated because of her pregnancy. (Docket Nos. 96-3 at 25; 100 ¶ 67; 112-1 ¶ 67).

Civil No. 22-1167 (GMM)
Page -50-

66. Casillas admitted that no one at Bayer ever told her they disapproved of her pregnancy or made any negative comments about her pregnancy. (Docket No. 96-3 at 25).

67. Casillas admitted that she had no documents that show the direct reason she was terminated was her pregnancy. (Docket No. 96-3 at 25-26; 100 ¶ 69; 112-1 ¶ 69).

68. Casillas declared that she has no witness who will testify that they know for a fact she was terminated because of her pregnancy. (Docket No. 96-3 at 28-29; 100 ¶ 70; 112-1 ¶ 70).

69. Casillas admitted that Badía never said or did anything to make her believe she disapproved of her pregnancy. (Docket No. 96-3 at 47; 100 ¶ 71; 112-1 ¶ 71).

70. On two separate occasions while Casillas worked at Bayer, co-worker Ríos became pregnant, gave birth, and went on maternity leave, and was not terminated. (Docket No. 96-3 at 58; 96-8 at 17; 100 ¶ 80).

71. On February 8, 2021 at 12:07 pm, HR Operations from Bayer USA sent Casillas an e-mail and regarding COBRA that stated the following: "Fidelity can help with your 401k and COBRA questions. If you choose salary continuation payments, your current health and welfare benefits will continue through your severance period." (Docket No. 116-2 at 2).

72. On February 17, 2021 at 5:29 pm, Rodríguez-Wells sent an e-mail to Casillas indicating: "Your separation documents are attached. If you have any questions, please reach out to hrop_separations_usa@bayer.com, or your HRBP." (Docket No. 116-3 at 3).

73. On March 9, 2021 at 6:22 pm, Casillas wrote an e-mail to Badía and Rodríguez-Wells which, in pertinent part, states the following:

Civil No. 22-1167 (GMM)
Page -51-

        Greetings [Rodríguez-Wells], [Matos] & [Badía]

        I hope this message finds you well.

        As per my email dated 2/18, I have been evaluating your severance offer, but my mind is filled with worries, which is making me anxious.

        I wish to confirm that, if I do not sign the severance documents, my termination date will continue to be April 22, 2021, and that my salary, 2020 and 2021 bonuses, health insurance plan, and company vehicle use will remain active until that date.

        If I do not accept the severance from the USA, thus keeping April 22 as termination date, just one month before the estimated date of my delivery, you are putting me in an extremely delicate and detrimental situation. I find myself in the difficult position of looking for alternatives that include COBRA, which I assume is too high of a cost, because neither Benefits in the USA, even after opening a ticket, nor you have been able to confirm the cost.

        (Docket No. 116-5 at 1).

74. On March 9, 2021 at 7:47 pm, Rodríguez-Wells responded the following to Casillas:

        Greetings [Casillas], As we told you during the various calls that we had to go over questions, and as the documents we sent you show, you may discuss with the HR Operations' team any questions you may have regarding this plan by calling at the telephone number that appears on the documents we reviewed and that we shared with you (1-888-473-1001 option 5). Also, said documents contain instructions and the answers to your

questions. Please, contact them so that
you may clear up your doubts.

(Docket No. 116-6 at 1).

75. On March 12, 2021 at 2:33 pm, Casillas sent an e-
mail to Rodríguez-Wells which states the following:
"Greetings I have not received any answers for my
questions in the email below. It is very
important." (Docket No. 116-3 at 2).

76. On March 12, 2021 at 2:38 pm, Rodríguez-Wells
responded: "I have attached the email I sent you on
Tuesday advising you to contact HR Operations at
(1- 888-473- 1001 option 5). We went over this
during the calls we had, and it is also clearly
established in the documents we shared with you."
(Docket No. 116-3 at 1-2).

77. On March 12, 2021, at 3:13 pm, Casillas replied the
following:

Greetings [Rodríguez-Wells] & team I did
not receive the email you sent me on
Tuesday. Thanks for attaching it.
Honestly, I do not find an answer for my
question in the severance documents, I
would greatly appreciate it if you could
point me to the part of the document
where I can find it. After rendering
services for almost a decade, I think
it's not much to ask. I am simply trying
to gather as much information as possible
in order to make an important decision.
I contacted Danny at HR Operations and he
told me on several occasions that these
questions should be addressed by the
local HR. After insisting and explaining
him 3 times that I had already tried that
option and that you asked me to contact
them, Danny opened a case with HR
Separation #6002445847. I hope I have
better luck with them once they contact
me.

(Docket No. 116-3 at 1).

78. On March 12, 2021, at 3:18 pm, Rodríguez-Wells responded: "[Casillas], Unfortunately, we do not have the answers, please contact them and refer to the case number assigned to you so that they can give you the answers." (Docket No. 116-3 at 1).

79. On March 12, 2021, at 4:28 pm, Rodríguez-Wells responded to an e-mail from Casillas stating the following:

[Casillas],

According to the documents that I shared with you, your date of termination is April 22, regardless of the decision you make, as I told you on February 16, you must return the car by that date.

Regarding the benefits, the documents establish: [The following text was originally written in English: "For additional information regarding any of the benefits listed below, please refer to the applicable SPD or visit the Bayer Benefits Center at benefits.bayer.us or contact them directly at 1-888-473-1001, option 1."]

Regarding COBRA, as we have told you, we do not have information about costs or other COBRA details. Page 5 of Bayer's FAQ states: [The following text was originally written in English: "What are COBRA benefits for continuing medical, dental and vision coverage? You may elect to continue your medical, vision and dental insurance by paying the full cost of the benefit plus a 2% administrative fee. COBRA allows you to continue your medical, vision and dental coverage for up to 18 months from your last day of work. For example: If you received 16 weeks (or 4 months) of severance through installment payments, and you pay the

Civil No. 22-1167 (GMM)
Page -54-

                    employee contribution during severance,
at the end of your severance period you
will be eligible to continue your
medical, vision and dental benefits for
14 additional months through the COBRA
provision (at 102% of the premium). You
will receive an information package on
your COBRA rights and the cost of
continuing medical, dental and vision
benefits through COBRA from the Bayer
Benefits Center. This package will be
mailed to your home address. COBRA
notices will be mailed to your home
address within 14 days of the end of the
month in which you receive your last
severance payment, if you have any
remaining eligibility under COBRA."]

                    (Docket No. 116-8 at 1).

80. On March 15, 2021, at 9:59 am, in response to an e-
mail from Casillas, Rodríguez-Wells stated the
following:

                    The documents that we reviewed during the
TEAMs session where we shared the screen
and those that I sent you before that,
show the definitions of the dates, you
may refer to them so that you may be clear
as to what is what. Also, I shared with
you HR Separation's email address in one
of the emails I sent you, you may contact
them directly to clear up any doubts you
may have. Once again, the email address
is hrop_separations_usa@bayer.com.

                    (Docket No. 116-9)

81. On April 5, 2021, Casillas wrote an e-mail to
Rodríguez-Wells and Badía which stated the
following:

                    I hope you are doing well. I am writing
to you because I have been asked to
furnish a letter stating that my family
health insurance benefits with Humana

> terminate on April 30th, 2021. Please
> confirm when will I receive the letter so
> I can start looking for a new medical
> coverage, which is always important,
> particularly at this time when I am in
> the final weeks of my pregnancy.

> (Docket No. 116-10).

82. On April 6, 2021 at 8:07 am, Hilda Matos, Bayer HR
Coordinator, wrote an e-mail to Casillas which, in
pertinent part, states the following:

> Hope you are well. The letter you are
> requesting, that stipulates the
> termination date of your medical plan
> Humana, should be done through HROP
> Separations USA. I am copying Kelly Neal,
> so that she is aware that you will be
> making the request for a letter to HROP
> Separations.

> (Docket No. 96-24 at 6-7).

83. On April 7, 2021 at 9:08 am, Candace Brown from
Bayer USA wrote an e-mail to Casillas stating the
following:

> What I can do is follow up with Benefits
> and request if they can provide a letter.
> Before I do that, I don't show we
> received your signed Agreement. Once you
> return that, along with the Lump Sum
> Request form, that will automatically
> term your benefits. Can you confirm when
> you will plan to return your Agreement?

> (Docket No. 96-24 at 4-6).

84. On April 8, 2021 at 11:43 am, Candace Brown from
Bayer USA wrote an e-mail to Casillas stating the
following:

> [Casillas], The benefits letter you
> originally requested was not attached.
> Per my response to your original

> question, I stated I needed your signed
> Severance Agreement and Lump Sum Form, so
> that I can process your severance and
> term your benefits. This will initiate
> the COBRA letter you need to verify the
> termination of benefits.
>
> (Docket No. 96-24 at 1-2).

85. On April 8, 2021 at 11:54 am, Kelly Neal, HR Analyst
    Separations of Bayer USA wrote an e-mail to
    Casillas, Rodríguez-Wells and Badía which, in
    pertinent part, states the following:

    > Looking back through [Casillas]'s file,
    > it looks like her signed agreement was
    > due back a few weeks ago, yet it has not
    > yet been received. [Casillas], based on
    > the information above, we are going to
    > move forward with entering your
    > termination effective 4/23/21, with no
    > severance entry. This will have your
    > benefits end on 4/30/21. I will email you
    > a letter stating 4/30/21 as the benefits
    > end date.
    >
    > (Docket No. 96-24 at 1).

86. Bayer, through Rodríguez-Wells, offered Casillas a
    Severance Agreement subject to the execution of a
    waiver and release and Plaintiff's agreement to
    remain working with the Company for 30 days, until
    February 22, 2021. (Docket No. 96-2 ¶ 109; 110 ¶
    109).

87. Through the Severance Agreement Bayer proposed to
    pay Casillas for a period of 60 days (until April
    22, 2021), and the 12-week severance pay, subject
    to the execution of the referenced waiver and
    release. (Docket No. 96-2 ¶ 110; 110 ¶ 110).

88. Casillas did not sign the Severance Agreement.
    (Docket No. 96-2 ¶ 111; 110 ¶ 111).

Civil No. 22-1167 (GMM)
Page -57-

89. The Bayer Benefits Department, through a third party, Fidelity, was in charge of sending COBRA notices. (Docket No. 96-2 ¶ 119; 96-5 at 82-84; 100 ¶ 83-84; 110 ¶ 119.

90. At the time of her termination of employment at Bayer, Casillas's postal address was and remains to date: 5777 Maxim Tower, Tartak Street Apt. 203, Carolina, Puerto Rico. (Docket No. 96-3 at 85; 100 ¶ 85; 112-1 ¶ 85).

91. The COBRA notice letter addressed to Casillas is dated April 28, 2021, and identified in its header with Assembly Code 4.BI-H-700A and ENV#BI04266813001000030. (Docket No. 95-35).

92. The COBRA notice is addressed to 5777 Maxim Tower, Tartak Street Apt. 203, Carolina, Puerto Rico. (Docket No. 100 ¶ 88; 100-13; 112-1 ¶ 88).

93. Fidelity included Casillas's COBRA notice in a COBRA Mailing Kit batch with 32 other letters as reflected in the Banner page used for the mailing operations. (Docket No. 119-1).

## V.    APPLICABLE LAW AND DISCUSSION

A.    <u>Title VII: Discrimination Based on Sex and Pregnancy</u>

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII also makes it an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy

Civil No. 22-1167 (GMM)
Page -58-

Discrimination Act of 1978 extended Title VII's protection against
discrimination to specifically include discrimination "on the
basis of pregnancy, childbirth or related medical conditions." 42
U.S.C. § 2000e(k). *See also* Serrano-Colon v. U.S. Dep't. of
Homeland Sec., 121 F.4th 259 (1st Cir. 2024); Martinez-Burgos v.
Guayama Corp., 656 F.3d 7, 12 (1st Cir. 2011). As such, it is now
well-settled law that that an employer may not discharge or
otherwise discriminate against an employee based on the
categorical fact of her pregnancy. *See* Young v. United Parcel
Serv., Inc., 575 U.S. 206 (2015); Martinez-Burgos, 656 F.3d at 12;
Smith v. F.W. Morse & Co., 76 F.3d 413, 424 (1st Cir. 1996).

In this case, Casillas argues that Bayer discriminated
against her based-on sex and pregnancy status when she was
terminated from her employment. While "[a] Title VII sex
discrimination claim may be proven with direct evidence of
discrimination, such as 'an admission by the employer that it
explicitly took actual or anticipated pregnancy into account in
reaching an employment decision[,]' [s]uch 'smoking gun' evidence
is rare." Gonzalez-Carpio v. Bracha & Success Enter. LLC, No. CV
23-1256 (FAB), 2025 WL 227197, at *4 (D.P.R. Jan. 17, 2025)
(*quoting* Santiago-Ramos, 217 F.3d at 53)) (internal citations
omitted). Accordingly, sex discrimination may be proven through
circumstantial evidence. Id.

Civil No. 22-1167 (GMM)
Page -59-

Thus, where, as here, there is no direct evidence of discrimination, to analyze whether discrimination can be inferred under Title VII from the undisputed facts, the Court applies the well-known three-step McDonnell Douglas burden-shifting framework. *See* Serrano-Colon, 121 F.4th at 270; Diaz v. City of Somerville, 59 F.4th 24, 28, 32 (1st Cir. 2023) (*citing* McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under that framework, Casillas first "must put forth evidence from which a reasonable juror could find that she had established a prima facie case of discrimination under Title VII." Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020). Namely, she must identify evidence "that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person." Id. (*quoting* Bonilla-Ramirez v. MVM, Inc., 904 F.3d 88, 94 (1st Cir. 2018)). In a reduction in force setting, "the fourth prong is unworkable because the plaintiff's position no longer exists." Lewis v. City of Boston, 321 F.3d 207, 214 n. 6 (1st Cir.2003). The further inquiry in the reduction in force setting becomes whether the Defendant did not treat gender neutrally "in making its decision to terminate [the Plaintiff] or retained personnel outside of [her] protected class in the same position." Id. at 214.

Civil No. 22-1167 (GMM)
Page -60-

The First Circuit has described the initial *prima facie* requirement as "not especially burdensome," "not onerous," "easily made," and a "small showing." Ferrer-Marrero v. Misey Rest., Inc., 2019 WL 6833824, at *15 (D.P.R. Dec. 13, 2019) (*quoting* Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995)). Once Casillas succeeds in making out a *prima facie* case, "[t]he burden of production then 'shifts to the [defendants] to state a legitimate, nondiscriminatory reason for the adverse employment action[s].'" Paul v. Murphy, 948 F.3d at 49 (first alteration in original) (*quoting* Burns v. Johnson, 829 F.3d 1, 9 n.8 (1st Cir. 2016)). If Bayer articulates such a justification, it is entitled to summary judgment unless Casillas raises a genuine issue of material fact that "the reasons offered by [the defendant] were a pretext for discrimination." Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019) (*quoting* Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015)) (alteration in original).

Altogether, the Court must decide "whether, viewing the 'aggregate package of proof offered by the [parties] and taking all [reasonable] inferences . . . [] a genuine issue of fact [is raised] as to whether the termination of [her] employment was motivated by discrimination." Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000).

Civil No. 22-1167 (GMM)
Page -61-

1. <u>Casillas Sets Forth a *Prima Facie* Case of Sex Discrimination</u>

We begin with the first step: her *prima facie* case. Casillas belongs to a class that Title VII protects from discrimination: She is a woman, and during the relevant time, she was pregnant. According to the undisputed facts and evidence on record, Casillas performed her job satisfactorily. In addition, Casillas was subject to an adverse employment action because she was terminated. Here, Bayer argues that a fourth prong in <u>McDonnell Douglas</u> test applies, as this a reduction in force case. "A plaintiff whose employment was terminated in the course of a reduction in force need not demonstrate that [she] was replaced, but may show that the employer did not treat" a protected class member neutrally or that persons outside the protected class were retained in the same position. <u>Goldman v. First Nat. Bank of Boston</u>, 985 F.2d 1113, 1117 (1st Cir. 1993) (*quoting* <u>Hebert v. Mohawk Rubber Co.</u>, 872 F.2d 1104, 1111 (1st Cir. 1989) (applying the fourth prong to age discrimination); <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1173 n. 5 (1st Cir.), *cert. denied*, 501 U.S. 1218 (1991).

In this case, the record reflects that another woman that was not pregnant remained in the position that was retained. Thus, the Court finds that Casillas has established a *prima facie* case of discrimination on the basis of pregnancy.

The Court now advances to the second step of the <u>McDonnell</u> <u>Douglas</u> analysis. Accordingly, the burden shifts to Bayer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

2.   <u>Bayer Has Set Forth a Legitimate, Nondiscriminatory</u> <u>Reason for the Adverse Employment Action</u>

Bayer rebuts the discrimination presumption by asserting it had a legitimate, non-discriminatory, business reason for Casillas's adverse employment action: Project Thrive. The uncontested record reflects that according to Bayer USA, the objective of Project Thrive was to implement changes in the company's Consumer Health company in North America to continue to grow Bayer's business by investing in areas that will drive strategic advances in the future, in part through streamlining operations and cutting positions. *See* (Docket Nos. 96-2 ¶ 16; 96-4 at 41; 96-5 at 33; 96-6 at 17; 100 ¶ 13; 110 ¶ 16; 112-1 ¶ 13).

To establish Project Thrive as its legitimate and non-discriminatory reason for terminating Casillas, Bayer has presented evidence that includes e-mail communications with and from Bayer USA directives, spreadsheets documenting the slate process and deposition testimony from Casillas's supervisor Badía, as well as from Rodríguez-Wells, Bayer's Human Resources Lead. Specifically, on record are e-mails submitted by both Casillas and

Civil No. 22-1167 (GMM)
Page -63-

Bayer in support of their respective motions that demonstrate communications regarding the implementation of Project Thrive by Bayer USA. The facts and evidence indicate that Bayer USA announced the implementation of Project Thrive on October 2, 2020.

The evidence on record also indicates that Badía was instructed by Bayer USA management to perform an analysis and produce recommendations as to which full time employee position would be eliminated in the Consumer Health Division in Puerto Rico. Moreover, the record shows that through January 2021 communications were exchanged between Badía and Rodríguez-Wells, from Bayer in Puerto Rico, and Bayer USA management, Morante and Juhng from HR Bayer USA, regarding Project Thrive and the decision to terminate Casillas's employment. *See* (Docket No. 96-19 at 1).

At this stage of the test, the Court finds that the evidence is sufficient for Bayer to rebut the presumption created by Casillas and shifts the burden of persuasion back to Plaintiff.


   3.   <u>The record is sufficient to support a finding of pretext.</u>

The Court moves to the last step of the <u>McDonnell Douglas</u> framework. In the final stage of the analysis, the burden is on Casillas — who as Plaintiff retains the ultimate burden of persuasion on the issue of discriminatory motive throughout — to point sufficient evidence to establish that Bayer's justification

Civil No. 22-1167 (GMM)
Page -64-

for the adverse employment action is not the true reason for her
termination but rather a pretext for pregnancy discrimination. *See*
Serrano-Colon, 121 F.4th at 271 (*quoting* Theidon v. Harvard Univ.,
948 F.3d 477, 497 (1st Cir. 2020)). To do so, Casillas "must offer
'some minimally sufficient evidence, direct or indirect, both of
pretext and of [Bayer's] discriminatory animus.'" Serrano-Colon,
121 F.4th at 271 (*quoting* Pearson v. Mass. Bay Transp. Auth., 723
F.3d 36, 40-41 (1st Cir. 2013)) (emphasis in the original). "[The
plaintiff] must elucidate specific facts which would enable a jury
to find that the reason given is not only a sham, but a sham
intended to cover up the employer's real and unlawful motive of
discrimination." Theidon, 948 F.3d at 497 (*quoting* Vélez v. Thermo
King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009)).

When it boils down to "pretext," the First Circuit has
recognized that "there is no 'mechanical formula.'" Ferrer
Marrero, 2019 WL 6833824, at *17 (*quoting* Che v. MBTA, 342 F.3d
31, 39 (1st Cir. 2003); Feliciano de la Cruz v. El Conquistador
Resort & Cntry. Club, 218 F.3d 1, 6 (1st Cir. 2000). Rather, the
inquiry often relies on individual facts that highlight
"weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons such
that a factfinder could infer that the employer did not act for
the asserted non-discriminatory reasons." Acevedo-Milan v. Home

Civil No. 22-1167 (GMM)
Page -65-


Etc. Incorporado, No. CV 18-1526 (GAG), 2020 WL 5875163, at *12
(D.P.R. Oct. 1, 2020) (*quoting* Pagán v. Banco Santander de Puerto
Rico, Civil No. 09-1226 (JAG) 2011 WL 570552 at *8 (D.P.R. 2011));
Santiago-Ramos, 217 F.3d at 55. Inconsistencies in the evidence as
to the rationale for which an individual was terminated can create
sufficient grounds for a finding of pretext. Román, 2025 WL
2693402, at *8.

In parsing these individual facts, the First Circuit has
warned courts to be "'particularly cautious' in granting summary
judgment on a discrimination claim" when the case turns on "whether
the employer's stated reasons are pretextual." Kosereis v. Rhode
Island, 331 F.3d 207, 215 (1st Cir. 2003); Hodgens v. Gen. Dynamics
Corp., 144 F.3d 151, 167 (1st Cir. 1998)); Santiago-Ramos, 217
F.3d at 54 ("[C]ourts should exercise particular caution before
granting summary judgment for employers on such issues as pretext,
motive, and intent").

After a careful review of the record and drawing all
reasonable inferences in the light most favorable to the non-
moving parties, as it must, this Court finds that certain
inconsistencies, incoherencies, and contradictions in the record
are sufficient to raise issues of material fact as to pretext. Out
of the "particular caution" with which this Court is charged to
act when it comes to pretext, this Court notes several factors

Civil No. 22-1167 (GMM)
Page -66-

that could lead a reasonable juror to conclude Bayer acted with pretext in terminating Castillas.

    a.  Ambiguities and contradictions as to Project Thrive
        abound in the record.

"Another method of establishing pretext is to show that [Defendant's] nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action." Santiago-Ramos, 217 F.3d at 56.

Here, Plaintiff has established that in December 2020, she was in the process changing her company-car. At the time, Plaintiff was also coordinating with Badía the discussion of the year-end self-assessment and check-in, receiving a response from Badía regarding the process on December 10, 2020. Thereafter, on January 22, 2021, a meeting was scheduled with Casillas to discuss her annual performance review with her supervisor, Badía. However, on that date she was informed of her termination, and as per her testimony, she was informed for the first time that it was due to Project Thrive.

Defendant's legitimate business motivation rests on the fact that Casillas was terminated per a directive under Project Thrive. But the parties dispute the exact dates of the initiative. Bayer avers Project Thrive began on October 2, 2020 and ended in early 2021. (Docket No. 112-1 at 3-4). But elsewhere, Bayer indicated that Project Thrive completed at the end of 2020. (Docket No. 96-

Civil No. 22-1167 (GMM)
Page -67-

2 ¶¶ 14, 18). Moreover, Badía indicated that the targeted end date was in November 2020. (Docket No. 96-4 at 39-40). Plaintiff, in turn, alleges that Lockwood-Taylor, Bayer's President, announced that Project Thrive had been completed on December 11, 2020. (Docket No. 112 at 11). This predates Morante and Badía's e-mail exchange on December 14, 2020 where they decided to terminate Casillas's position. It also predates Casillas's notification of her termination on January 22, 2021. Defendant then suggests that Lockwood-Taylor's announcement applied only to continental Bayer teams, and not to Puerto Rico. (Docket No. 110 at 5). Yet Defendants point to no language in Lockwood-Taylor's announcement to indicates Project Thrive ended only stateside.

Other facts further muddy the waters. The record indicates that at least one town hall took place to discuss Project Thrive in November 2020, and that a recording of that meeting exists. (Docket Nos. 1 ¶ 23; 96-2 ¶ 19; 96-9; 110 ¶ 19; 112-1 ¶ 18). Contested facts in the record also suggest several other meetings between the Bayer Puerto Rico team and Bayer USA took place that indicated that Project Thrive was largely a stateside initiative and would not affect the Puerto Rico team. (Docket No. 112-1 at 4).

As such, this Court finds a genuine issue of material fact arises as to the impact of Project Thrive, particularly as to

Civil No. 22-1167 (GMM)
Page -68-

whether the restructuring initiative included the Puerto Rico
Consumer Health Division and, if so, whether it ended before
Casillas was slated to be terminated. The inconsistency and
contradictions in the record to date could allow a reasonable juror
to conclude that Project Thrive was an after-the-fact pretextual
justification for choosing to eliminate Casillas's position based
on her pregnancy.

      b.   <u>Rodríguez-Wells and Badía's discussion of
Casillas's pregnancy before her termination raises
contradictions and doubts as to discriminatory
animus.</u>

In assessing a claim of pretext in an employment
discrimination case, this Court must focus on the motivations and
perceptions of the actual decisionmaker. <u>Bennett v. Saint-Gobain
Corp.</u>, 507 F.3d 23, 31 (1st Cir. 2007). Furthermore, when
determining whether an employer's stated reason for terminating an
employee was pretextual, "the biases of those who . . . make or
influence the employment decision are probative." <u>Cariglia v.
Hertz Equip. Rental Corp.</u>, 363 F.3d 77, 85 (1st Cir. 2004).

In this case, it is uncontested that Badía was Casillas's
supervisor and the person charged with the decision-making power
to select the position that was to be eliminated in the Consumer
Health Division in Puerto Rico. To this point, although the record
is devoid of direct comments or innuendos addressing Casillas's

Civil No. 22-1167 (GMM)
Page -69-

pregnancy, there is deposition testimony that raises issues of fact as to discriminatory animus and pretext.

The record reflects that Badía asked Human Resources Lead Rodríguez-Wells whether, after reviewing company policies, she could consider Casillas's pregnancy in her elimination analysis. (Docket No. 96-5 at 59-61). In response, Rodríguez-Wells advised Badía that under Puerto Rico labor law, Plaintiff's pregnancy could not be considered in favor or against the selection of candidates for termination. (Id.). She also added that applicable legal principles of local law precluded the company from disposing of mandated criteria, such as seniority under Puerto Rico laws such as Law 80. (Id.).

This gives the Court pause. Defendant's preemptive conversation with Human Resources to ask about considering Casillas's pregnancy could suggest that the pregnancy might have played some role, albeit legally permissible, in deciding whether Casillas should be terminated.

The Court does not think it is necessarily improper for Badía and Rodríguez-Wells to consider Casillas's pregnancy in light of governing laws. Indeed, pregnancy-related adverse employment actions violates Law 80 in Puerto Rico. Medina v. Adecco, 561 F. Supp. 2d 162, 175 (D.P.R. 2008). Moreover, "Title VII mandates that an employer must put an employee's pregnancy to one side in

Civil No. 22-1167 (GMM)
Page -70-

making its employment decisions — but the statute does not command that an employer bury its head in the sand and struthiously refrain from implementing business judgments simply because they affect a parturient employee." Smith, 76 F.3d. at 424. "Title VII is neither a shield against this broad spectrum of employer actions nor a statutory guaranty of full employment, come what may." Id. at 425. "[P]regnancy does not confer total immunity. An employer may discharge an employee while she is pregnant if it does so for legitimate reasons unrelated to her pregnancy." Id. at 424 (internal citations omitted).

The Court, however, is mindful that a reasonable jury could find that this conversation raises doubt as to the legitimacy of Casillas's discharge. In other words, Badía's question to the Human Resources department as to whether she could consider Casillas's pregnancy — before Badía has even engaged in the process of filling out the slate template or weighing the performances of Williams and Casillas to decide which of the two will be terminated — creates inconsistency and doubts about Defendant's intent as to why Casillas was terminated. The Court defers to the rightful position of the jury as factfinder to resolve these competing interpretations.

c.  Communications between Bayer personnel indicate
shifting rationales as to Casillas's termination.

It is uncontested that Bayer has a policy in place which established a procedure for staff reductions. (Docket Nos. 96-2 ¶ 39; 96-4 at 43-44; 96-16; 100 ¶ 49; 110 ¶ 39). Furthermore, the Staff Reductions Policy states that "[r]educing staff requires review by the Human Resources and Law Departments and must be approved by the senior management or the authorized designee of the impacted business unit and/or division.

It is also uncontested that both Badía, as a supervisor in Puerto Rico, and Morante, as Bayer USA management, were charged with communicating matters regarding Project Thrive. Hence, the Court turns its attention to the e-mail communications between Morante and Badía. Their exchanges raise further inconsistencies. The Court has already decided that any testimony provided by Badía that refers to any command from Morante is not hearsay. *See*, *supra,* Section III.A. Notwithstanding, there is other admissible evidence on record that calls into question the rationale that Badía and Morante used to choose to eliminate Casillas's position and retain Williams.

In particular, Badía sent an e-mail to Morante on December 14, 2020 with a rationale document and a spreadsheet attachment that lists both Williams's and Casillas's skills and comments about their performance (Docket Nos. 96-4 at 71-73; 100-8; 100-11). But

Civil No. 22-1167 (GMM)
Page -72-

Badía was prompted by Morante to spell out more clearly how Badía came to her result: "Hi. I didn't see the slate ratings/explanations here. How are you choosing which shopper candidate to keep?" (Docket Nos. 96-2 ¶ 76; 96-18 at 14; 110 ¶ 76). Less than fifteen minutes later, Badía replied: "The person to be slate is Jenniffer Casillas. In the top line of the excel spreadsheet is detailed. In conversation with [Rodríguez-Wells], she suggest[ed] to use seniority in the equation too. If you want we can discuss it briefly." (Id.)

Two hours later, Badía sent an updated spreadsheet, modifying her description of Williams in the spreadsheet and including a new paragraph in the rationale document describing why Williams was chosen to remain. (Docket Nos. 96-2 ¶ 78; 96-4 at 71; 96-18 at 10; 96-19 at 2; 100-9 at 1; 112-1 ¶ 44; 110 ¶ 78). Shortly thereafter, Badía is prompted by Morante to further document her decision-making process: "I am not reading what separates the two," Morante emailed Badía. "What specifically makes Bilmarie the choice?" (Docket Nos. 96-2 ¶ 77; 96-18 at 8-9; 110 ¶ 77). Two hours later, Badía attaches an updated spreadsheet and updated rationale document. (Docket Nos. 96-2 ¶ 78; 96-4 at 71; 96-18 at 10; 96-19 at 2; 100-9 at 1; 112-1 ¶ 44; 110 ¶ 78).

Again, the Court pauses at the several questions this exchange raises.

Civil No. 22-1167 (GMM)
Page -73-


First, the Court notes that the reasons for selecting Williams

change over the course of two hours. Badía presents three versions

in total:

1. Original input in "Comments" column: "[Williams] is
   a complete and well rounded Team player. She has
   been identified as a potential successor for PR
   Division Manager position." (Docket Nos. 96-2 ¶ 75;
   96-18 at 6; 110 ¶ 75).

2. Modified input in "Comments" column: "My
   recommendation is to retain Bilmarie Williams in
   the organization based on the following assessment.
   **[Williams] has more experience in day to day
   management in the organization, providing a more
   agile response to business future needs.** She
   understands being the only marketing resource
   within the team and is capable of successfully
   prioritize market and business needs. She can
   manage and support operational roles of a CBM
   functions as well. She is a results oriented
   manager and negotiates effectively with AMG Brokers
   account. [Williams] is a complete and well rounded
   Team player. She has been identified as a potential
   successor for PR Division Manager position."(Docket
   Nos. 96-2 ¶ 78; 96-4 at 71; 96-18 at 10; 96-19 at
   2; 100-9 at 1; 112-1 ¶ 44; 110 ¶ 78) (emphasis
   added).

3. Modified rationale: "My recommendation to retain
   Bilmarie Williams in the organization **is based on
   seniority in the position.** [Williams] also have
   [sic] more experience in the day to day management
   in the organization, providing a more agile
   response to business future. She understands being
   the only marketing resource within the team and is
   capable of successfully prioritize [sic] market and
   business needs. She can manage operational roles of
   a CBM functions as well. She has also developed an
   excellent relationship with the Brokers customers."
   (Docket Nos. 100-11; 110-8) (emphasis added).

Civil No. 22-1167 (GMM)
Page -74-

Specifically, the modified comment and the rationale provide two different motivations as to why Williams was selected: the comment places a premium on Williams' performance as being better than Casillas', whereas the rationale explicitly states that the decision is "based on seniority in the position."

This shifting rationale raises pretext concerns. "Once an employer provides a reason for the termination, subsequent explanations that are inconsistent with or contradict the formally stated justification support an inference that the employer's proffered reason was pretextual." Román, 2025 WL 2693402, at *7; see Rodríguez Cardi v. MMM Holdings, Inc., 936 F.3d 40, 49 (1st Cir. 2019) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations [for an employee's termination], a jury may infer that the articulated reasons are pretextual.") (alterations in original) (quoting Domínguez-Cruz, 202 F.3d at 431-32).

Second, the modified rationale that bases the termination decision on seniority is inconsistent with Bayer company policy. Evidence that Bayer "deviated from its standard procedure or policies in taking an adverse employment action against [Casillas] may be relevant to the pretext inquiry." Rodríguez-Cardi, 936 F.3d at 50 (citing Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 142-43 (1st Cir. 2012)). "The rationale is that if an employer

has a policy or procedure that governs a specific situation but
fails to adhere to the same in taking an adverse employment action
. . . , then it might be inferred that the reason articulated for
taking the adverse employment action against the employee was not
true." Id.

Section 2.17 on "Staff Reductions" establishes that: "The
selection [of which employee to retain during staff reductions]
will be made by comparing, in this order of preference, (1)
required skills; (2) if skills are equal, documented performance;
and (3) if skills and performance are equal, company length of
service." (Docket Nos. 96-2 ¶ 42; 96-16 at 1; 110 ¶ 42). Seniority,
or "company length of service," should only be considered if skills
and performance are equal. Yet, both the modified comment and
modified rationale indicate that Williams is perceived to have
both superior skills and performance compared to Casillas. Badía's
decision, then, to root Williams's retention in her seniority
flouts Bayer's company-wide policies, bringing yet another
contradiction to this Court's attention. To boot, the statement in
the modified rationale that says Williams has more "seniority in
the position" is incorrect: while Williams spent more years working
at Bayer, Williams and Casillas had equally held the position of
Manager Customer and Shopper Act Solutions for five years.

Civil No. 22-1167 (GMM)
Page -76-

Third, Badía references another conversation with Rodríguez-Wells that encouraged Badía to consider seniority. Again, this foregrounding of seniority – considered not only by Badía, but a representative of the Human Resources department – flies in the face of Bayer's company policies.

Taken together, these contradictions and inconsistencies in protocol raise a reasonable inference of doubt and pretext as to Bayer's decision to terminate Casillas, especially considering the timeline of events following the announcement by Bayer USA regarding Project Thrive, Casilla's pregnancy announcement, and her eventual termination.

This Court is not interested in making mountains out of molehills. But it cannot turn a blind eye to these inconsistencies and contradictions in the record, however narrow they may be. While a juror could infer that Bayer's justification for Casillas's termination is solely related to Project Thrive, this Court cannot affirmatively discount, at the summary judgment stage, that a reasonable fact finder could find that the inconsistencies in the record show that Bayer's reasons for the termination amounted to pretext on the basis of Casillas's pregnancy.

Hence, considering the evidence, viewed in the light most favorable to the non-moving parties, the Court finds Plaintiff created a triable issue of fact as to pretext. Therefore, the Court

Civil No. 22-1167 (GMM)
Page -77-

denies summary judgment to Bayer on Casillas's Title VII
discrimination claim.

B.  <u>Title VII Retaliation</u>

Casillas also asserts claims for retaliation under Title VII.
Title VII prohibits employers from taking retaliatory action
against an employee who opposes any practice or act made unlawful
by it. *See* 42 U.S.C. § 2000e-3. To establish a retaliation claim
pursuant to Title VII, Casillas must demonstrate that: (1) she
engaged in a protected activity; (2) she suffered an adverse
employment action; and (3) there was a causal connection between
the adverse action and protected activity. *See* <u>Salgado-Candelario
v. Ericsson Caribbean, Inc.</u>, 614 F. Supp. 2d 151, 178 (D.P.R. 2008)
(Delgado-Colon, J.) (*citing* <u>Calero-Cerezo v. U.S. Dep't. of Just.</u>,
355 F.3d 6, 25 (1st Cir. 2004)).

The anti-retaliation provision protects only those actions
"taken to protest or oppose statutorily prohibited
discrimination." <u>Fantini v. Salem State Coll.</u>, 557 F.3d 22, 32
(1st Cir. 2009) (*citing* 42 U.S.C. § 2000e-3(a)) ("It shall be an
unlawful employment practice for an employer to discriminate
against any of his employees . . . because he has opposed any
practice made an unlawful employment practice by [Title VII], or
because he has made a charge, testified, assisted, or participated
in any manner in an investigation, proceedings, or hearing under

[Title VII].”). For instance, filing a charge with the EEOC is protected activity. *See* Cherkaoui v. City of Quincy, 877 F.3d 14, 28 (1st Cir. 2017).

Casillas fails to allege or proffer evidence establishing that she engaged in protected activity. She merely alleges that Bayer "retaliated" against her — after her termination — by allegedly not providing information regarding her health insurance because she did not sign the Severance Agreement provided. Signing or refusing to sign a Severance Agreement is not a protected activity; the uncontested factual record indicates it was merely a prerequisite for Bayer to engage in conversations with Casillas about her termination package and to set a commencement date for her benefits. (Docket No. 96-24 at 1-2). Because Casillas did not engage in protected activity, her Title VII retaliation claim, and retaliation claim under analogous Puerto Rico law, must be dismissed.


C.   Supplemental Claims

Casillas alleges Puerto Rico law claims arising out of the same nucleus of facts as her Title VII claim. Specifically, she posits that Bayer violated the following Puerto Rico laws: Law 80; Law 100; Law 69; Law 3; and Article 1536 of the 2020 Puerto Rico Civil Code. The Court addresses the Puerto Rico law claims in turn.

Civil No. 22-1167 (GMM)
Page -79-

1.  Law 80

Law 80 is Puerto Rico's Wrongful Dismissal Act. It provides relief to employees who are terminated "without good cause" as the term is defined in the Act. P.R. Laws Ann. tit. 29, § 185a. The initial burden for a Law 80 claim rests with the plaintiff to establish that she was dismissed without justification. Hoyos v. Telecorp Commc'n, Inc., 488 F.3d 1, 6 (1st Cir. 2007). In turn, the employer must demonstrate "by a preponderance of the evidence that the discharge was made for good cause as contemplated by Law 80." Id. Section 2 of Law 80 provides a non-exhaustive list of circumstances that constitute just cause for termination. Specifically, the statute provides three examples of just cause, that relate to company restructuring or downsizing. *See* P.R. Laws Ann. tit. 29, § 185b (d), (e), (f). However, "[a] discharge made by mere whim or fancy of the employer or without cause related to the proper and normal operation of the establishment shall not be considered as a discharge for [just] cause." Id.

A plaintiff who meets her burden to establish pretext under the McDonnell Douglas framework makes out a claim for wrongful discharge under Law 80, since the plaintiff sufficiently raises doubt as to whether the employer has "good cause" for the termination. *See* Lahens v. AT&T Mobility Puerto Rico, Inc., 28 F.4th 325, 338 (1st Cir. 2022) (*citing* Acevedo v. Stericycle of

Civil No. 22-1167 (GMM)
Page -80-


P.R., Inc., Civ. No. 19-1652 (JAG), 2020 WL 1126168 at *5 (D.P.R.
Mar. 6, 2020); Sánchez Borgos v. Venegas Const. Corp., Civ. No.
07-1592 (SEC), 2009 WL 928717 (D.P.R. Mar. 31, 2009), *on
reconsideration*, Civ. No. 07-1592 (SEC), 2009 WL 1297221 (D.P.R.
May 7, 2009)).

Hence, since Casillas demonstrated existence of a triable
issue of fact under McDonnell Douglas, Bayer's argument that it
terminated Casillas for just cause fails. Triable issues remain
regarding the real reason behind Bayer's decision to terminate
Casillas. As such, her Law 80 claims also survive summary judgment.


   2.   Claims Under Law 3, Law 100 and Law 69

"Law 100 is a general employment discrimination statute,
making it unlawful for employers to discharge or discriminate
against an employee on the basis of age, race, color, religion,
sex, social or national origin, or social condition. P.R. Laws
Ann. tit 29, § 146. This statute is analogous to Title VII in many
respects." Pérez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d
19, 26 n. 10 (1st Cir. 2011) (*citing* Monteagudo v. Asociación de
Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 169 n.
3 (1st Cir. 2009) (describing Law 100 as an analog to Title VII)).

Though Law 100 echoes Title VII, "Law 100 is much more
plaintiff-friendly than its federal counterpart." Ruiz v.

Caribbean Rests., Inc., 54 F. Supp. 2d 97, 120 (D.P.R. 1999) (*citing* Dominguez v. Eli Lilly & Co., 958 F. Supp. 721, 744 (D.P.R. 1997), *aff'd sub nom.* 141 F.3d 1149 (1st Cir. 1998)). "The most salient distinction between [Title VII and Law 100] is that Law 100 establishes a rebuttable presumption of discrimination unless the employer can demonstrate that the action in dispute was justified." Colon-Muriel v. Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio, 499 F. Supp. 2d 98, 111 (D.P.R. 2007) (*citing* Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998). This places upon the employer not only the burden of production, but also a burden of persuasion. Id.

The same rationale is applicable to the Law 69 and Law 3 analysis. *See* P.R. Laws Ann. tit. 29, § 1321 (prohibiting gender discrimination); P.R. Laws Ann. tit. 29, § 1321 (prohibiting pregnancy-based discrimination); Mejias Miranda, 120 F. Supp. 2d at 174 (finding "the same conclusion must be reached" under Law 100 as under Laws 69 and 3 in an employment pregnancy discrimination case); Colon-Muriel, 499 F. Supp. 2d at 112-13 (same). Therefore, since Casillas's discrimination claims survive under Title VII, they must equally survive under the aforementioned Puerto Rico discrimination laws.

Civil No. 22-1167 (GMM)
Page -82-

3.  <u>Tort Claim under the Puerto Rico Civil Code</u>

Casillas alleges that the Bayer is also liable to her under Puerto Rico's general tort statute, under Article 1536 of the Puerto Rico Civil Code of 2020, P.R. Laws Ann. tit. 31, § 10801. Yet, when a specific labor-employment provision covers the conduct for which plaintiff seeks damages, she is barred from relying on that conduct to sustain a tort claim. *See* <u>Rosario-Velazquez v. Corporacion Educativa Ramon Barquin</u>, No. CV 23-1347 (PAD), 2024 WL 3522412, at *4 (D.P.R. July 24, 2024) (*citing* <u>Reyes-Feliciano v. Marshalls</u>, 159 F. Supp. 3d 297, 310 (D.P.R. 2016)(articulating formulation); <u>Franceschi-Vázquez v. CVS Pharmacy</u>, 183 F. Supp. 3d 333, 344-345 (D.P.R. 2016)(dismissing tort claim because plaintiff failed to identify tortious conduct separate from that covered by employment laws); <u>Rivera-Almodóvar v. Instituto Socioeconomico Comunitario, Inc.</u>, 806 F. Supp. 2d 503, 508-509 (D.P.R. 2011) (similar).

A review of the Complaint shows there is no tortious conduct separate from conduct subject to Title VII, Law 100, Law 69, Law 3, and Law 80. In consequence, Casillas's tort claim must be dismissed.

Civil No. 22-1167 (GMM)
Page -83-

D.    <u>COBRA Claim</u>

Finally, the Court addresses Casillas's COBRA claim. COBRA requires employers to give employees the opportunity to continue health care coverage for a specified period after a "qualifying event," at the employee's expense. 29 U.S.C. § 1161(a); *see* <u>Claudio-Gotay v. Becton Dickinson Caribe, Ltd.</u>, 375 F.3d 99, 103 (1st Cir. 2004). Termination of employment is considered a qualifying event. 29 U.S.C. § 1163(2).

COBRA is silent on the sufficiency of notice, but the First Circuit takes the position that "a good faith attempt to comply with a reasonable interpretation of the statute is sufficient." <u>Duchesne v. Banco Pop. De Puerto Rico, Inc.</u>, 742 F. Supp. 2d 201, 216 (D.P.R. 2010) (*citing* <u>Torres-Negron v. Merck & Co., Inc.</u>, 488 F.3d 34, 46 (1st Cir. 2007)); *see also* <u>Degruise v. Sprint Corp.</u>, 279 F.3d 333, 336 (5th Cir.2002) ("Employers are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails."); <u>Smith v. Rogers Galvanizing Co.</u>, 128 F.3d 1380, 1383-84 (10th Cir. 1997)); <u>Branch v. G. Bernd Co.</u>, 764 F. Supp. 1527, 1534 n. 11 (M.D. Ga. 1991) ("Courts have generally validated methods of notice which are calculated to reach the beneficiary.").

Moreover, courts that have analyzed COBRA's notice requirements have concluded that mailing a notice to an employee's

Civil No. 22-1167 (GMM)
Page -84-

last known address constitutes a good faith attempt at COBRA compliance. *See* Vanderhoof v. Life Extension Inst., 988 F. Supp. 507, 518 (D.N.J. 1997) (Former employer complied with its obligations under COBRA by mailing notice of former employee's COBRA rights to her listed home address, despite former employee's claim that she never received such notice). In addition, many courts have held that COBRA does not require actual receipt of notification by the plan participant. *See* Vangas v. Montefiore Med. Ctr., 823 F.3d 174, 183 (2d Cir. 2016) ("When an employer mails a COBRA notice to a covered employee's last known address, the notice is reasonably calculated to reach recipient and the employer is deemed to be in good faith compliance with COBRA's notification requirements.") (internal quotation omitted); Chesney v. Valley Stream Union Free Sch. Dist. No. 24, 2009 WL 936602, at *4 (E.D.N.Y. March 31, 2009); Ramos v. SEIU Local 74 Welfare Fund, 2002 WL 519731, at *5 (S.D.N.Y. April 05, 2002); DeGruise v. Sprint Corp., 279 F.3d 333, 337 (5th Cir. 2002). In fact, "courts have routinely granted summary judgment in favor of employers (or plan administrators) despite an employee's claim that he or she did not receive notice if the employer (or plan administrator) sets forth sufficient proof that it made a good faith effort to comply with the COBRA notice requirements." Daneshvar v. Graphic Tech., Inc., 18 F. Supp. 2d 1277, 1295 (D. Kan. 1998) (*citing* Shafrir v. Ass'n

Civil No. 22-1167 (GMM)
Page -85-

of Reform Zionists of Am., 998 F. Supp. 355, 364 (S.D.N.Y.1998)
(summary judgment granted despite claim of no receipt where
defendant's personnel administrator signed two sworn affidavits
that she sent plaintiff COBRA notification)); *see also* Gibbs v. A.
Finkl & Sons Co., No. 00 C 4546, 2002 WL 318291 (N.D. Ill. Feb.
26, 2002) (holding defendant met its burden under COBRA where
benefits administrator testified as to standard office procedure
regarding COBRA notification and that computer records confirm
that a COBRA notice was generated); *cf*. Claudio-Gotay, 375 F.3d at
104-05 (lacking a sworn declaration that the company complied with
COBRA's notice requirements and the Court found the evidence
consisting of a letter and a note did not show that the letter was
mailed).

In this case, Casillas claims that Bayer failed to comply
with its statutorily imposed duty to notify her of her rights under
COBRA. Bayer, in turn, claims that it is not liable under the
statute because it is not the administrator, and that the third-
party Fidelity sent the COBRA notice. As to the first argument, an
employer is permitted to delegate giving COBRA post-termination
notice to a third party. However, the duty of notification
ultimately lies with the employer, even if a plan administrator or
a third-party company is designated to disseminate COBRA notices.
*See* Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1231

Civil No. 22-1167 (GMM)
Page -86-

(11th Cir. 2002). Hence, the employer will not be relieved of liability where there is no evidence the third party sent out a notice. Id.

Here it is undisputed by the parties that Fidelity was in charge of sending COBRA notices on behalf of Bayer. Nevertheless, Casillas argues that she never received the COBRA notice. She further contends that Bayer told her they did not have the information related to COBRA and referred her to Bayer USA's Human Resources Separation Department and to Fidelity. However, according to Bayer, Fidelity generated a COBRA notice letter on April 27, 2021, and mailed it to Casillas at her postal address on April 28, 2021.

A review of the record reflects that in support of this contention Bayer provided: (1) a copy of the COBRA Notice, consisting of an eight-page letter dated April 28, 2021 and addressed to Casillas to her postal address in Carolina, Puerto Rico. (Docket Nos. 96-35; 119-1 at 352); (2) a copy of a COBRA Mailing Kit with a "Banner Page" (Docket No. 119-1 at 1-2); (3) copies of a batch 33 COBRA Notices, including the one addressed to Casillas; and (4) a declaration under penalty of perjury submitted by Fidelity's custodian of records. (Docket No. 119-1 at 1).

As discussed by the Court previously, when addressing the admissibility of those documents, a further analysis of the record

Civil No. 22-1167 (GMM)
Page -87-

shows that the COBRA Mailing Kit contains a "Banner Page",
typically used in print and mailing operations, which demonstrates
that it was generated on April 27, 2021. This "Banner Page" also
includes the Assembly Code 4.BI-H-700A and CM Output Batch 4289968.
These codes are the same included in the copies of the COBRA notice
addressed to Casillas and to the 32 other employees included in
the batch. Also, the letter addressed to Casillas bears the
matching numbers: 4.BI-H-700A and ENV#BI04266813001000030.
Furthermore, Mrs. Otero, Fidelity's custodian of records provided
a declaration under penalty of perjury in which she authenticated
the COBRA Mailing Kit and the letter dated April 28, 2021, which
was addressed to Casillas at the last known address.

Casillas did not come forward with any evidence to the
contrary. She merely insists that she never received the COBRA
notice. Yet, during her deposition testimony she confirmed that
the address included in the COBRA Notice letter was her correct
postal address. *See* (Docket No. 96-3 at 85). Furthermore, on record
are a series of e-mail exchanges between Casillas and Bayer
personnel regarding inquiries as to COBRA. Those communications
only show that Bayer referred Casillas to Fidelity and to the Bayer
USA Benefits Department who were the entities the held the answers
and information she was requesting. In any case, those e-mail
exchanges do not show bad faith and merely show Bayer was very

responsive to her communications, although their content was not of her liking.

In the alternative, assuming *in arguendo* that Bayer did in fact fail to give appropriate notice under COBRA, the Court finds that the statutory penalty established by statute should not be imposed. Under Section 502(c)(1) of the Employee Retirement Income Security Act of 1974, a penalty of up to $110 per day may be assessed for failure to provide a COBRA notice. 29 U.S.C. § 1132(c)(1). Courts, however, have been reluctant to impose the statutory penalty in the absence of a showing of bad faith and when the failure to notify has not resulted in any prejudice to the plaintiff. If the plan participant cannot show that she has been adversely affected in some significant fashion, the discretionary penalty allowed by the statute is rarely imposed. *See, e.g.*, Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 588-89 (1st Cir. 1993) (stating that even though the district court need not find bad faith or prejudice to impose penalties, it may give dispositive weight to these factors); *see also* Bartling v. Fruehauf Corp., 29 F.3d 1062, 1068-69 (6th Cir. 1994); Godwin v. Sun Life Assurance Co. of Canada, 980 F.2d 323, 328-29 (5th Cir. 1992); Wesley v. Monsanto Co., 554 F. Supp. 93 (E.D. Mo. 1982); Pollock v. Castrovinci, 476 F. Supp. 606 (S.D.N.Y. 1979).

Civil No. 22-1167 (GMM)
Page -89-

In the case at bar, no civil penalty should be imposed on Bayer as there is no evidence in the record indicating that it acted in bad faith, as previously discussed. In addition, there is no evidence that Plaintiff was prejudiced in any manner because of Bayer's behavior. On the contrary, under oath, during her deposition testimony, Casillas affirmed that her health insurance with Bayer terminated on April 30, 2021, and that she obtained health insurance through her husband's company, DDB Latina, effective May 1, 2021. She admitted that there was never a day when she was without health insurance and that her husband's insurance was less costly than the one provided under COBRA. *See* (Docket No. 96-3 at 86-89).

Under these circumstances, the Court finds that Casillas did not suffer any prejudice because of Bayer's alleged failure to comply with its COBRA obligations and that Bayer did not act in bad faith. Therefore, even if Defendants failed to provide adequate COBRA notice, no statutory penalty should be imposed under these circumstances. Accordingly, Plaintiff's COBRA claim shall also be dismissed.

**Civil No. 22-1167 (GMM)**
**Page -90-**

### V.    CONCLUSION

For the reasons explained above, Plaintiff's *Motion In Limine and Requesting order to Strike Exhibit 14 [Docket 100-4] from Defendant's Motion for Summary Judgment* at Docket No. 121 is **GRANTED IN PART AND DENIED IN PART.**

The Court also **GRANTS IN PART AND DENIES IN PART** Defendant's *Motion for Summary Judgment and Memorandum of Law in Support Thereof* at Docket No. 101 and **GRANTS IN PART AND DENIES IN PART** Plaintiff's *Motion for Summary Judgment* at Docket No. 96. Plaintiff's Title VII discrimination, Law 80, Law 100, Law 69, and Law 3 claims survive, and Plaintiff's Title VII retaliation, Article 1536, and COBRA claims are dismissed.

IT IS SO ORDERED.

In San Juan, Puerto Rico, September 30, 2025.


s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE